## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sumaya Aden, as next-of-kin and trustee for the Estate of Isak Abdirahman Aden, Decedent<br><br>                              Plaintiff,<br><br>v.<br><br>City of Bloomington, Minnesota; City of Burnsville, Minnesota; City of Eagan, Minnesota; City of Edina, Minnesota; Officer Jacob Peterson; Officer Matthew Ryan; Officer Daniel Nelson; Officer Adam Stier; Officer Anthony Kiehl; Chief Roger New; Lieutenant Andrew Speakman; Sergeant Corey Cardenas; Sergeant Maksim Yakovlev; and John and Jane Does 1-10,<br><br>                              Defendants. | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

Sumaya Aden, as trustee for the Estate of Isak Abdirahman Aden, Decedent (hereinafter the "Estate") brings this action against Defendants for damages and other relief relating to, *inter alia*, claims under the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. §§ 1983 and 1988, the Constitution of the State of Minnesota, and other tort/negligence law.  As for its causes of action against the above-named defendants, the Estate states and alleges as follows:

### INTRODUCTION

1.      This civil rights and state tort action seeks compensatory and punitive damages from defendants for violating various rights under the United States Constitution, Minnesota Constitution, and state law in connection with the fatal officer-involved shooting of Isak Abdirahman Aden on July 2, 2019.

1

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because the Estate asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

3.      This Court has supplemental jurisdiction over the Estate's claims arising under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## PARTIES

5.      At all relevant times, Decedent Isak Abdirahman Aden was an individual residing in Columbia Heights, Minnesota.

6.      Sumaya Aden is the sister of Isak Abdirahman Aden and was appointed the trustee of the estate of Isak Abdirahman Aden on December 26, 2019 by the Honorable M. Jacqueline Regis, District Court Judge of the Fourth Judicial District, County of Hennepin, Minnesota, court file number 27-cv-19-21119.

7.      At all relevant times, Defendant City of Bloomington, Minnesota (hereinafter "Defendant Bloomington") is and was a municipal corporation existing under the laws of the State of Minnesota.  Defendant Bloomington is a chartered subdivision of the State of

Minnesota with the capacity to be sued.  Defendant Bloomington is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Bloomington Police Department and its agents and employees.  At all relevant times, Defendant Bloomington was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Bloomington Police Department and its agents and employees complied with the laws of the United States and State of Minnesota.  At all relevant times, Defendant Bloomington was the employer of Defendants Ryan, Nelson, Stier, Kiehl, Cardenas.

8.      At all relevant times, Defendant City of Burnsville, Minnesota (hereinafter "Defendant Burnsville") is and was a municipal corporation existing under the laws of the State of Minnesota.  Defendant Burnsville is a chartered subdivision of the State of Minnesota with the capacity to be sued.  Defendant Burnsville is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Burnsville Police Department and its agents and employees.  At all relevant times, Defendant Burnsville was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Burnsville Police Department and its agents and employees complied with the laws of the United States and State of Minnesota.  At all relevant times, Defendant Burnsville was the employer of Defendant Yakovlev.

9.      At all relevant times, Defendant City of Eagan, Minnesota (hereinafter "Defendant Eagan") is and was a municipal corporation existing under the laws of the State of Minnesota.  Defendant Eagan is a chartered subdivision of the State of Minnesota with

the capacity to be sued.  Defendant Eagan is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Eagan Police Department and its agents and employees.  At all relevant times, Defendant Eagan was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Eagan Police Department and its agents and employees complied with the laws of the United States and State of Minnesota.  At all relevant times, Defendant Eagan was the employer of Defendants New, Speakman, and Peterson.

10.    At all relevant times, Defendant City of Edina, Minnesota (hereinafter "Defendant Eagan") is and was a municipal corporation existing under the laws of the State of Minnesota.  Defendant Edina is a chartered subdivision of the State of Minnesota with the capacity to be sued.  Defendant Edina is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Edina Police Department and its agents and employees.  At all relevant times, Defendant Edina was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the Edina Police Department and its agents and employees complied with the laws of the United States and State of Minnesota.

11.    Defendants Bloomington, Burnsville, Eagan, and Edina shall hereinafter be collectively referred to as the "Defendant Cities."

12.    At all relevant times, Defendant Jacob Peterson was a police officer for Eagan Police Department and was acting under color of law within the course and scope of his duties as an officer of the Eagan Police Department and with complete authority and ratification of his principal, Defendant Eagan.  In doing the acts and/or failing or omitting

4

to act as hereinafter described, Defendant Peterson was acting on the implied and actual permission and consent of Defendant Cities and Defendants New, Speakman, Cardenas, and Yakovlev.  Defendant Peterson is sued in his individual capacity and in his official capacity as an officer of the Eagan Police Department.

13.     At all relevant times, Defendant Matthew Ryan was a police officer for the Bloomington Police Department and was acting under color of law within the course and scope of his duties as an officer of the Bloomington Police Department and with complete authority and ratification of his principal, Defendant Bloomington.  In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Ryan was acting on the implied and actual permission and consent of Defendant Cities and Defendants New, Speakman, Cardenas, and Yakovlev. Defendant Ryan is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

14.     At all relevant times, Defendant Daniel Nelson was a police officer for the Bloomington Police Department and was acting under color of law within the course and scope of his duties as an officer of the Bloomington Police Department and with complete authority and ratification of his principal, Defendant Bloomington.  In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Nelson was acting on the implied and actual permission and consent of Defendant Cities and Defendants New, Speakman, Cardenas, and Yakovlev. Defendant Nelson is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

15.     At all relevant times, Defendant Adam Stier was a police officer for the Bloomington Police Department and was acting under color of law within the course and

scope of his duties as an officer of the Bloomington Police Department and with complete authority and ratification of his principal, Defendant Bloomington.  In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Stier was acting on the implied and actual permission and consent of Defendant Cities and Defendants New, Speakman, Cardenas, and Yakovlev. Defendant Stier is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

16.     At all relevant times, Defendant Anthony Kiehl was a police officer for the Bloomington Police Department and was acting under color of law within the course and scope of his duties as an officer of the Bloomington Police Department and with complete authority and ratification of his principal, Defendant Bloomington.  In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Kiehl was acting on the implied and actual permission and consent of Defendant Cities and Defendants New, Speakman, Cardenas, and Yakovlev. Defendant Kiehl is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

17.     Defendants Peterson, Ryan, Nelson, Stier, and Kiehl are hereinafter collectively referred to as the "Lethal Force Defendants."

18.     At all relevant times, Defendant Roger New was the Chief of Police for the Eagan Police Department with managerial, supervisory, and policymaking duties and was acting under color of law within the course and scope of his duties as an officer of the Eagan Police Department and with complete authority and ratification of his principal, Defendant Eagan. In doing the acts and/or failing or omitting to act as hereinafter described, Defendant New was acting on the implied and actual permission and consent of

6

Defendant Cities.  Defendant New is sued in his individual capacity and in his official capacity as an officer of the Eagan Police Department.

19.    At all relevant times, Defendant Andrew Speakman was a Lieutenant for the Eagan Police Department with managerial, supervisory, and policymaking duties and was acting under color of law within the course and scope of his duties as an officer of the Eagan Police Department and with complete authority and ratification of his principal, Defendant Eagan. In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Speakman was acting on the implied and actual permission and consent of Defendant Cities. Defendant Speakman is sued in his individual capacity and in his official capacity as an officer of the Eagan Police Department.

20.    At all relevant times, Defendant Corey Cardenas was a Sergeant for the Bloomington Police Department with managerial, supervisory, and policymaking duties and was acting under color of law within the course and scope of his duties as an officer of the Bloomington Police Department and with complete authority and ratification of his principal, Defendant Bloomington.  In doing the acts and/or failing or omitting to act as hereinafter described, Defendant Cardenas was acting on the implied and actual permission and consent of Defendant Cities. Defendant Cardenas is sued in his individual capacity and in his official capacity as an officer of the Bloomington Police Department.

21.    At all relevant times, Defendant Maksim Yakovlev was a Sergeant for the Burnsville Police Department and was acting under color of law within the course and scope of his duties as an officer of the Burnsville Police Department and with complete authority and ratification of his principal, Defendant Burnsville.  In doing the acts and/or

7

failing or omitting to act as hereinafter described, Defendant Yakovlev was acting on the implied and actual permission and consent of Defendant Cities. Defendant Yakovlev is sued in his individual capacity and in his official capacity as an officer of the Burnsville Police Department.

22.     Defendants New, Speakman, Cardenas, and Yakovlev are hereinafter collectively referred to as the "Supervising Defendants."

23.     At all relevant times, Defendants John and Jane Does 1-10 were officers in the various police departments and were acting under color of law within the course of his or her duties as an officer for their respective law enforcement agency and with complete authority and ratification of his or her principals, the Defendant cities, Defendant Dakota, and/or Defendant Minnesota. In doing the acts and/or failing or omitting to act as hereinafter described, Defendants John and Jane Does 1-10 were acting on the implied and actual permission and consent of Defendant Cities, Defendant Dakota, and Defendant Minnesota and Defendants New, Speakman, Cardenas, and Yakovlev. Defendants John and Jane Does 1-10 are sued in their individual and official capacities.

24.     The true names and capacities, whether individual, corporate, association, or otherwise of Defendants John and Jane Does 1-10, inclusive, are unknown to the Estate, who otherwise sues these Defendants by such fictitious names. The Estate may seek leave to amend this compliant to show the true names and capacity of these Defendants when they have been ascertained and new information comes to light. Each of the fictitiously named Defendants is responsible in some manner for the conduct and liabilities alleged herein.

25.     The parties identified in Paragraphs 6 – 23 shall hereinafter be collectively referred to as the "Law Enforcement Defendants."

26.     All of the acts complained of herein by the Estate against Law Enforcement Defendants were done and performed by said Law Enforcement Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose and scope of said agency, service, and/or employment capacity.   Moreover, Law Enforcement Defendants and their agents ratified all of the acts complained of herein.

## FACTS COMMON TO ALL CLAIMS

**Isak Abdirahman Aden was a Young, Black, Somali Male Who was Well-Loved and Respected in his Community, a Dedicated Employee, and Promising Student at the University of Minnesota.**

27.     Mr. Aden was a young, Black male of Somali descent.

28.     Mr. Aden had no criminal history, other than driving violations.

29.     Mr. Aden had no history of violence.

30.     Mr. Aden immigrated to the United States in 2006 from Somalia with his grandmother and younger siblings after the deaths of both of his parents in the Somali civil war.

31.     As the eldest, Mr. Aden acted as the head of his family, caring and providing for his younger siblings and elderly grandmother.

32.     Mr. Aden was a driven, intelligent, and successful man.  He worked at Wells Fargo for many years before being recruited by Spire Credit Union.  He studied at the

University of Minnesota, majoring in information technology and pursuing a career in cyber security.  He also owned his own home healthcare company.

33.    Mr. Aden was well-loved and respected by his family, friends, co-workers, and community.

34.    The Law Enforcement Defendants unjustifiably shot and killed Mr. Aden when he was just 23 years of age.

**Ms. Asnake Notified the Law Enforcement Defendants that Mr. Aden was Upset Due to the Dissemination of Explicit Photographs of Him and that He Did Not Threaten Her with the Handgun or have a History of Violence.**

35.    Mr. Aden and Tigst Asnake were in a romantic relationship, which lasted for approximately 9 months.

36.    An argument between Mr. Aden and Ms. Asnake precipitated the facts relevant to this lawsuit.

37.    Prior to the unlawful killing of Mr. Aden by the Law Enforcement Defendants, Ms. Asnake provided the Law Enforcement Defendants relevant information.

38.    Prior to the killing, she notified the Law Enforcement Defendants that Mr. Aden did not have a history of violence generally or towards her.

39.    Prior to the killing, she notified the Law Enforcement Defendants that on or around July 2, 2019, Mr. Aden drove to Ms. Asnake's apartment, arriving before Ms. Asnake returned home from work.  Ms. Asnake stated that this was not unusual.

40.    Prior to the killing, she notified the Law Enforcement Defendants that Mr. Aden was upset because he believed that Ms. Asnake had disseminated explicit photographs of Mr. Aden without his knowledge or consent.

41.    Prior to the killing, she notified the Law Enforcement Defendants that Mr. Aden told her that he earlier received an anonymous phone call wherein an individual stated that he or she had viewed explicit photographs of Mr. Aden.

42.    Prior to the killing, she notified the Law Enforcement Defendants that upon her arrival home from work, Mr. Aden and Ms. Asnake spoke in her vehicle for approximately 20-30 minutes before they drove away from her apartment complex together in her car.

43.    Prior to the killing, she notified the Law Enforcement Defendants that Mr. Aden never threatened her with the handgun, admitting that her prior statement to the 911 operator that Mr. Aden had threatened her with a handgun was untrue.

44.    Prior to the killing, she clarified to the Law Enforcement Defendants that she only saw the handgun in Mr. Aden's waistband and became panicked, causing her to flee the vehicle.

45.    The Law Enforcement Defendants described Ms. Asnake as hostile, uncooperative, and angry.

46.    When the Law Enforcement Defendants went to Ms. Asnake's home, she refused to answer the door.

47.    Ms. Asnake further refused to answer telephone calls from the Law Enforcement Defendants and, when she did, she told the Law Enforcement Defendants that she was busy, refused to answer the Law Enforcement Defendants' inquiries, and abruptly hung up on the Law Enforcement Defendants.

48.     Although Ms. Asnake called 911 at approximately 6:05 p.m. on July 2, 2019, she refused to meet face-to-face with the Law Enforcement Defendants until hours later.

49.     Detective Karin Pederson, a member of the Eagan Police Department's negotiation team, recalled that Ms. Asnake told the Law Enforcement Defendants that "I don't care if you shoot him or I do or he shoots himself, I want out."

50.     At the time of the shooting, the Law Enforcement Defendants knew that Ms. Asnake had been uncooperative and combative, had made threatening statements regarding Mr. Aden, and had significantly changed the story she originally described to the 911 operator.

**The Law Enforcement Defendants' Militarized, Aggressive Response Fully and Securely Contained Mr. Aden to the Vacant, Industrial Parking Lot and Virtually Eliminated any Risk to the Public.**

51.     At approximately 6:44 p.m. on July 2, 2019, the Law Enforcement Defendants, responding to Ms. Asnake's 911 call, located Mr. Aden walking in an industrial area north of the intersection of Highway 13 and Seneca Road in Eagan, Minnesota.

52.     Mr. Aden thereafter walked into a vacant, industrial parking lot located at 1971 Seneca Drive, Eagan, Minnesota, sat down on a curb, and placed a handgun to his head.

53.     Mr. Aden sat down on the curb in the vacant industrial parking lot at 6:44 p.m., long after normal business hours and when the area was largely unoccupied.

54. The Law Enforcement Defendants thereafter mounted a militarized response involving multiple jurisdictions, quickly and fully containing Mr. Aden with both an inner and outer perimeter.

55. The Law Enforcement Defendants' manned the inner and outer perimeter with dozens of law enforcement personnel and vehicles and were assisted by an industrial fence and gate which, for reasons unexplained, the Law Enforcement Defendants elected not to close despite having four armored vehicles on site.

56. In the inner perimeter, the Law Enforcement Defendants positioned no less than two dozen officers, many or all of whom were highly trained members of the elite special weapons and tactics ("SWAT") teams.

57. These team members wore tactical body armor and helmets, carried military-style assault weapons and/or less lethal weapons, and/or were equipped with bullet-proof and/or resistant ballistic shields.

58. At least four members of the SWAT teams were highly trained snipers armed with sniper rifles and positioned on a rooftop across the street or in the grass directly in front of Mr. Aden.

59. Assisting these officers were at least three K-9 units, which were to be deployed to chase down, attack, and subdue Mr. Aden if he attempted to run from the parking lot.

60. Additionally, the Law Enforcement Defendants utilized a Mine-Resistant Ambush Protected vehicle ("MRAP") and two Bearcat Armored Tactical Vehicles, placing

such in front and to the left of Mr. Aden and stationing SWAT team members armed with assault rifles in the vehicles' gun turrets.

61.     A fourth armored vehicle was additionally on scene and available to the Law Enforcement Defendants.

62.     The Law Enforcement Defendants' containment of Mr. Aden was further assisted by a tall, industrial fence directly to Mr. Aden's right that fully enclosed an automobile repair shop parking lot.

63.     The Law Enforcement Defendants illuminated the area with flood lights and headlights from multiple vehicles.

64.     The Law Enforcement Defendants could clearly observe Mr. Aden after dark because of the flood lights and headlights.

65.     The flood lights and headlights also largely blinded Mr. Aden to police movements.

66.     The inner perimeter, consisting of SWAT teams, snipers, K-9 units, armored vehicles, and an industrial fence fully and completely contained Mr. Aden.

67.     However, the Law Enforcement Defendants also created a secondary, outer perimeter to further contain Mr. Aden, which was comprised of dozens more officers and police vehicles.

68.     This outer perimeter also included units that further sealed a small gap between the industrial fence and the building located at 1971 Seneca Road.

69.     The Law Enforcement Defendants responded to Mr. Aden with overwhelming force and there was no reasonable possibility that Mr. Aden could escape from the scene.

70.     Indeed, it is difficult to imagine how an individual could be better contained than to be surrounded by multiple perimeters comprised of SWAT teams, patrol officers, armored vehicles, snipers, K-9 units, and an industrial fence.

71.     Further, the overwhelming show of force, including by using vehicles and weapons designed exclusive for assault, from four metropolitan police departments was inappropriate to the situation and unnecessarily heightened tension and added confusion and fear to a situation that could have been brought to a peaceful resolution rather than resulted in the death of Mr. Aden.

**Multiple Audio and Video Recordings Clearly Show that Mr. Aden Posed No Immediate Threat for At Least Four Hours Prior to the Assault.**

72.     At approximately 6:44 p.m. Mr. Aden sat on the curb in the vacant parking lot and, at approximately 10:37 p.m., the Law Enforcement Defendants launched an assault against Mr. Aden that began with the throwing of a flashbang grenade and resulted in Mr. Aden's death.

73.     The events in the vacant industrial parking lot were recorded on multiple audio and video recording devices.

74.     The audio and/or video recordings show that Mr. Aden remained seated on the curb at all times between 6:44 p.m. and 10:37 p.m.

75.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden attempt to stand up from his seated position.

76.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden attempt to flee.

77.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden intentionally point the handgun at a law enforcement.

78.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden make intentional, threatening gestures towards a law enforcement officer.

79.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden even point a finger towards a law enforcement officer.

80.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden verbally threaten to harm, injure, or kill any person other than himself.

81.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden issue any ultimatum.

82.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden act erratically.

83.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. did Mr. Aden act aggressively towards any law enforcement officer.

84.     The audio and/or video recordings show that at no time between 6:44 p.m. and 10:37 p.m. was Mr. Aden an immediate threat.

16

85.     The audio and/or video recordings show that Mr. Aden placed the handgun on the ground at approximately 8:56 p.m. and did not touch the gun at any time thereafter before the Law Enforcement Defendants threw the flashbang.

86.     At all times, Mr. Aden remained seated and calm and communicated with the Law Enforcement Defendants when he was permitted.

**The Law Enforcement Defendants Failed to Provide Mr. Aden Any Means to Communicate for Nearly Three Hours and Then Shot and Killed Mr. Aden Approximately One Hour Later Despite His Substantial Compliance with the Law Enforcement Defendants.**

87.     Eagan Police Department Officer Jeff Thul and Sergeant Matthew Ondrey were two of the initial responders.

88.     Soon after Mr. Aden initially sat down in the vacant parking lot, Sergeant Ondrey issued the first rules of engagement to other law enforcement officials, instructing that less lethal weapons and K-9 units were to be deployed should Mr. Aden attempt to flee from the parking lot, whether with or without the gun.

89.     As the Law Enforcement Defendants incorporated more and more personnel, including SWAT operators and armored vehicles, the rules of engagement should Mr. Aden attempt to flee were modified to require progressive use of force; permitting the use of less lethal weapons and then K-9 units and then, should both fail, the use of deadly force.

90.     Officer Thul initially attempted to communicate with Mr. Aden by shouting commands at Mr. Aden.

91.     In response to Officer Thul, Mr. Aden placed the gun on the ground.

92.    Officer Thul indicated that Mr. Aden attempted to respond verbally, but Officer Thul struggled to hear Mr. Aden over the sound of his vehicle's engine.

93.    Although Officer Thul stated in an interview the Minnesota Bureau of Criminal Apprehension ("BCA") that Mr. Aden was not threatening anyone with the handgun, Officer Thul recalled thinking shortly after the incident began that "I'm gonna have to shoot this guy."

94.    Officer Thul then moved into an armored vehicle and attempted to communicate with Mr. Aden on a public announcement speaker system.

95.    Eagan Police Department negotiator Officer Joseph Moseng relieved Officer Thul and assumed responsibility for communicating with Mr. Aden.

96.    Members of the Eagan negotiation team assisted Officer Moseng, including Detective Karin Pederson and Officer Moseng's partner, Officer Tracy Harrell.

97.    Officer Moseng continued to engage in one-way communications with Mr. Aden via the PA system after assuming control of the negotiations.

98.    However, because of the noise from the various police vehicles and Officer Moseng's location inside the armored vehicle, two-way communication between Mr. Aden and the Law Enforcement Defendants was virtually impossible and Mr. Aden could not communicate with the Law Enforcement Defendants.

99.    The Law Enforcement Defendants were aware that Mr. Aden could not communicate with the Law Enforcement Defendants.

100.    For almost three hours, the Law Enforcement Defendants failed to provide Mr. Aden with any means of two-way communication with Officer Moseng.

101.    It took the Law Enforcement Defendants nearly three hours to devise a plan to provide Mr. Aden with a cellular telephone, which they took from an officer on scene.

102.    The Law Enforcement Defendants monitored and recorded some, but not all, of the communications between the Officer Moseng and Mr. Aden on that cellular telephone.

103.    In total, the Law Enforcement Defendants engaged Mr. Aden in two-way communications for only one hour and sixteen minutes before launching an assault.

104.    Indeed, the Law Enforcement Defendants intended to assault Mr. Aden earlier, thereby intending to permit Mr. Aden even less time to communicate with the Law Enforcement Defendants, but called off the assault before it could be launched.

105.    Even after that short, additional delay, upon information and belief, the Law Enforcement Defendants assaulted Mr. Aden much more quickly and forcefully than other similarly situated individuals who were not of Mr. Aden's race, ethnicity, and national origin.

**Mr. Aden Engaged in Good Faith Communications with the Law Enforcement Defendants and, as a Result of those Communications, Agreed to Put the Gun Down at the Request of the Law Enforcement Defendants.**

106.    Although Mr. Aden walked into the vacant industrial parking lot at approximately 6:44 p.m., Mr. Aden initially had no effective means of communicating with the Law Enforcement Defendants because of the noise of vehicle engines and the nearby airport.

107.    After a three-hour delay, the Law Enforcement Defendants provided Mr. Aden with the cellular telephone and engaged in communications for one hour and sixteen minutes.

108.    In the brief period after receiving the cellular phone but before the assault, Mr. Aden was responsive to the Law Enforcement Defendants' efforts at communication.

109.    Mr. Aden repeatedly answered the Law Enforcement Defendants' telephone calls and had numerous conversations with Officer Moseng.

110.    Mr. Aden continued to engage in communications with the Law Enforcement Defendants at all times after receiving the cellular telephone and was speaking with Officer Moseng at the time of the assault.

111.    The communications by telephone between Officer Moseng and Mr. Aden resulted in significant de-escalation.

112.    At the request of the Law Enforcement Defendants, Mr. Aden put the handgun on the ground at approximately 8:56 p.m.

113.    At all times, Mr. Aden spoke to the Law Enforcement Defendants via that cellular telephone calmly and respectfully.

114.    When asked questions by the Law Enforcement Defendants, Mr. Aden responded directly and truthfully by, for instance, admitting that the gun had accidentally discharged when he tripped and fell.

115.    The Law Enforcement Defendants received no reports that Mr. Aden intentionally fired the weapon towards a law enforcement officer or any civilian.

116.    Instead, the Law Enforcement Defendants learned of a reported gunshot only after a civilian reported to 911 that he or she heard a gunshot.

117.    When asked if he had more weapons, Mr. Aden stated that he did not.

118.    Mr. Aden voluntarily admitted that the handgun in his possession belonged to his brother and that he took the handgun without his brother's permission.

119.    Mr. Aden also acknowledged that his decision to run from the vehicle was foolish and had caused the situation to be blown out of proportion.

120.    When the Law Enforcement Defendants asked Mr. Aden about his fight with Ms. Asnake, Mr. Aden confirmed the revised information that Ms. Asnake provided to the Law Enforcement Defendants; namely that he never pointed the handgun at Ms. Asnake or otherwise threatened her but, instead, that she only saw the handgun in his pants and became scared.

121.    Ultimately, Mr. Aden's only request of the Law Enforcement Defendants was to permit him to talk to Ms. Asnake, either in person or over the phone.

122.    When the Law Enforcement Defendants indicated that they were working to locate Ms. Asnake and see if Mr. Aden's request could be granted, Mr. Aden's only response was that he would wait; he made no threats.

123.    At the Law Enforcement Defendants' request, Mr. Aden placed the handgun on the ground at approximately 8:56 p.m., where it would remain untouched until the Law Enforcement Defendants needlessly placed the lives of Mr. Aden and their officers at risk by launching an unnecessary, unjustified, and ill-conceived assault on Mr. Aden at 10:37 p.m. that, seconds later, would inevitably result in his death.

**Mr. Aden's Only Request Was that He Be Permitted to Speak to Ms. Asnake So that He Could Prove to the Law Enforcement Defendants He Had Not Threatened Ms. Asnake with the Handgun.**

124.    When provided the telephone by the Law Enforcement Defendants, Mr. Aden used that phone to call Ms. Asnake, reaching her briefly on one or more occasions.

125.    Despite reaching Mr. Asnake on one or more occasions, Mr. Aden did not commit suicide or signal any intention to commit suicide while speaking with Ms. Asnake.

126.    Prior to the shooting, the Law Enforcement Defendants knew that Mr. Aden spoke to Ms. Asnake on one or more occasions on the cellular telephone provided to him by the Law Enforcement Defendants.

127.    The Law Enforcement Defendants, soon after locating and detaining Ms. Asnake, prevented Ms. Asnake from further communicating with Mr. Aden.

128.    Mr. Aden's only request of the Law Enforcement Defendants was that he be permitted to speak to Ms. Asnake.

129.    Mr. Aden stated clearly and repeatedly that he wished to talk to Ms. Asnake because she could tell the Law Enforcement Defendants that Mr. Aden had done nothing wrong and that this situation was a misunderstanding.

130.    Mr. Aden believed that by communicating with Ms. Asnake, he and/or the Law Enforcement Defendants could peacefully resolve the situation.

131.    Mr. Aden repeatedly stated that once Ms. Asnake confirmed that Mr. Aden had not done anything wrong, Mr. Aden would surrender himself and the Law Enforcement Defendants could have the weapon.

132.    Mr. Aden stated that he would walk away from the gun and surrender himself to the Law Enforcement Defendants.

**The Brief Communications Between Mr. Aden and the Law Enforcement Defendants Produced Immediate, Significant, and Positive Results.**

133.    Audio recordings of the communications between Officer Moseng and Mr. Aden confirm that the negotiations produced positive results.

134.    As a result of those communications, Mr. Aden agreed to put the handgun on the ground and stated that he would surrender himself.

135.    Mr. Aden and Officer Moseng had the following communications:

**9:30 p.m.**[1]

| | |
|---|---|
| Officer Moseng: | Um, hey, I appreciate you, I appreciate you putting the gun, down. Would you be willing to slide a little bit away from it? To your left? |
| Mr. Aden: | I'm ok right now. |
| Officer Moseng: | Ok. Ok, that's fine. Can you tell me a little bit of what happened here today? |
| Mr. Aden: | We were just arguing and shit. And then she saw the gun on, in my pocket and she just, she thought that I had it because of her or whatever, and then as we were driving she got out of the car and started screaming that I was going to shoot her and then I ran. |
| Officer Moseng: | Ok. To me, it doesn't seem like, it seems like it's a misunderstanding. Ok? So like I told you when I was talking to you, there was a report from one of the neighbors that maybe the gun accidentally fired while you were running. |
| Mr. Aden: | Yeah. I fell and it went off, and then I had to pick it up. |

---

[1] The following is an excerpt taken from a transcription of audio recordings of some, but not all, of the telephone communications between Officer Moseng and Mr. Aden.

.    .    .

Officer Moseng:    Ok.  What happens when she gets here?

Mr. Aden:    I wanna talk to her.

Officer Moseng:    And . . . but then what?  What's your plan after talking to her?

Mr. Aden:    Then it's fine.  You guys can have the gun.

Officer Moseng:    So, so you'll . . . let's say she comes down here.  You wanna talk with her and then you'll give us the gun?

Mr. Aden:    Yeah, she needs to tell you guys the truth.

.    .    .

Officer Moseng:    Ok.  Well, we are not aware of who's with her, 'cuz it's none of us.  Alright?  'Cuz she's done nothing but . . . but . . . has tried to avoid us and she downplayed whatever happened; said nothing happened, it was just an argument.

Mr. Aden:    I mean, that's what is was, but the way she acted in traffic made it seem like I was gonna shoot her.

Officer Moseng:    Well, that's why people called . . .

Mr. Aden:    . . . and that's why people stared to come out.

Officer Moseng:    Yup, people started coming out, and then they heard the gunshot go off in the woods and so really the only thing that we can confirm is that there was one gunshot in the woods, which is a misdemeanor offense.  It's no different than reckless driving.  It's a low-level crime.  That's the only thing right now that I'm aware of that you could possibly be in trouble for.  Ok?

Mr. Aden:    This is my brother's gun, not mine.

*    *    *

**9:58 p.m.**

24

Officer Moseng:    So I can tell you that if we can get you safely away from the gun, the odds if it happening are probably going to be much higher.

Mr. Aden:    I am gonna walk away from the gun when she is here.

Officer Moseng:    When she is here?

Mr. Aden:    Yeah, I am gonna walk away from it.  I am gonna kick it out.

Officer Moseng:    Excuse me?  I couldn't hear you.

Mr. Aden:    I said I am going to kick it out and get away from it.

.    .    .

Officer Moseng:    You've done a lot of positive things.  You put the gun down, which I greatly appreciate it.  You're a lot safer, so there's no accidents or anything like that where you'd get hurt.  You've moved away from it, which makes you even more safer.  Absolutely.  You've done a lot of good things to help calm the situation down.  You've made a lot of good decisions here.  So last thing is just stand up and put your hands up.  You and I can continue to talk and go from there, okay?

Mr. Aden:    No, I don't want to do that just yet.

*    *    *

**The Law Enforcement Defendants Chose to Not Allow the Situation to be Resolved Peacefully and Ignored Mr. Aden's Compliance, Seeing Only a Threatening Young, Black, Somali Male That Could Only Be Dealt with By Force.**

136.    Indisputably, the brief negotiations tolerated by the Law Enforcement Defendants de-escalated the situation.

137.    In the one hour and sixteen minutes of negotiation, Mr. Aden was engaged, calm, and respectful.

138.    In the one hour and sixteen minutes of negotiation, Mr. Aden provided the Law Enforcement Defendants important information, including verification of Ms.

Asnake's statements that Mr. Aden did not threaten her with the gun; agreed to put the gun down and kick it away (and would, in fact, not touch the gun again); told the Law Enforcement Defendants that he would surrender; and never made any threat or issued any ultimatum.

139. Despite the clear and obvious progress resulting from such negotiations, the Law Enforcement Defendants elected to resort to extreme and unjustifiable violence rather than continued communication.

140. The Law Enforcement Defendants communicated with Mr. Aden for one hour and sixteen minutes before concluding that, contrary to other situations where such communications continued for many hours, force was the only manner of dealing with a young, Black, Somali male.

141. The central figures in developing and authorizing the assault plan were Defendants New, Speakman, Cardenas, and Yakovlev.

142. Defendant New, the Chief of Police for the Eagan Police Department, commanded the scene and authorized the assault on Mr. Aden.

143. Defendants Speakman, Cardenas, and Yakovlev developed the assault plan and advocated for the assault against Mr. Aden to Defendant New.

144. At the time he authorized the assault, Defendant New lacked even the most basic situational awareness.

145. Contrary to the audio and video recordings, Defendant New stated that immediately prior to the assault, Mr. Aden made threatening and non-compliant statements.

146.    Defendant New, in an interview with the BCA said: "one of the last things I uh . . . recall the suspect saying [was that] he wasn't giving up, he wasn't going to put his gun down."

147.    Defendant New's statement that one of the last things Mr. Aden said prior to the assault was that Mr. Aden was not going to give up or put his gun down is factually inaccurate.

148.    Contrary to Defendant New's assertion, Mr. Aden complied with the Law Enforcement Defendants' requests that he put the weapon down and repeatedly stated to the Law Enforcement Defendants that he would surrender peacefully.

149.    Defendant New also impermissibly attributed deadly motives to Mr. Aden's benign conduct because Mr. Aden was a young, Black, Somali male.

150.    For instance, Mr. Aden could generally observe, as permitted by the blinding spotlights, the Law Enforcement Defendants as they moved personnel and vehicles about the scene and, as would be expected, looked in the direction of the Law Enforcement Defendants when such movement caught Mr. Aden's attention.

151.    Defendant New believed, however, that Mr. Aden's act of looking around alone justified the use of deadly force, stating to the BCA:

> [F]rom all my tactical training and law enforcement training, there were points where he was looking . . . when he turned and looked, it could have been deemed as deadly force . . . it's no different than if someone turns and has a gun, and how those officers perceive it. And, uh, ya know, they showed a great deal of restraint um because of that. I remember when I, when he turned around he looked in my direction. My immediate thought was, excuse me, holy shit, I'm backin' up.

152.    Defendant New's ascription of deadly motives to the benign conduct of Mr. Aden occurred because Mr. Aden was a young, Black male of Somali descent.

153.    Defendant New's ascription of deadly motives to the benign conduct of Mr. Aden occurred because Defendant New viewed Mr. Aden inherently and exclusively as a threat.

154.    Mr. Aden never pointed the weapon in the direction of the Law Enforcement Defendants or otherwise threatened any person, either by words or conduct.

155.    Yet, the Law Enforcement Defendants believed that Mr. Aden intended to shoot and kill the Law Enforcement Defendants simply because he looked in their direction.

156.    That ascription of deadly intent to the benign conduct of a Black, Somali male despite overwhelming evidence to the contrary is the epitome of prejudice and racial bias.

157.    The Law Enforcement Defendants would not have ascribed the same intent to such benign conduct had Mr. Aden been a white male dressed in busines suit.

158.    The Law Enforcement Defendants' prejudice and bias is wholly inconsistent with the actual conduct of Mr. Aden, who communicated, complied with the Law Enforcement Defendants' request to put the handgun down, and stated repeatedly that he intended to surrender and give the Law Enforcement Defendants the handgun.

159.    Further, Ms. Asnake had already confirmed to the Law Enforcement Defendants that Mr. Aden had no history of violence or criminal activity, which they could and should have corroborated by looking into Mr. Aden's background and criminal record.

160.    Defendant Speakman, a lieutenant for the Eagan Police Department and SWAT team supervisor, claimed credit for formulating the assault plan and fervently advocating its implementation.

161.    Defendant Speakman, however, was willfully oblivious to the positive results of the negotiations.

162.    Defendant Speakman stated to the BCA that he believed that the negotiations were unsuccessful and that an assault was necessary because Mr. Aden refused to comply with the Law Enforcement Defendants' commands to put the gun on the ground.

163.    Again, the gun had remained on the ground untouched for an hour and a half prior to the assault.

164.    In that interview with Defendant Speakman, the BCA (as it did with every person it interviewed) presented to Defendant Speakman leading questions designed to solicit responses that could be used to justify the killing of Mr. Aden.

165.    Yet, even in response to these leading questions, Defendant Speakman could not recall whether Mr. Aden had, in fact, complied with the Law Enforcement Defendants' commands.

166.    The following is taken from the BCA's interview with Defendant Speakman:

BCA:            Ok.  Perfect.  Um now just a quick question about the subject and what either he did or didn't do.  Um are you aware um, was the individual given commands [ ] to put down this firearm [or] move away from it and so forth?

Speakman:    Yes.

BCA:            Did he comply with those?

Speakman:      No he did not.

BCA:           Okay.  Did he comply with any of the commands or none of them or?

Speakman:      I don't know if um at one point he did uh at one point he did put the gun down.

BCA:           Okay.

Speakman:      Whether or not that was on his own or at the continued requests of commands, but uh he did put the gun down next to him at one point.

BCA:           Ok.  So I'll ask a follow up question then.  Um, *if he put the gun down based on the requests from the negotiators who were speaking with him*, um are you aware if he was subsequently asked to move away from the gun?

Speakman:      He was.

BCA:           Did he do that?

Speakman:      Uh, I believe at one point he did, but I don't know the distance.

167.    Defendant Speakman, the individual that designed and advocated for the assault, was never aware whether Mr. Aden was compliant with the commands of the Law Enforcement Defendants or whether the continued negotiations were producing positive results.

168.    Ultimately, Mr. Aden's compliance with the Law Enforcement Defendants was irrelevant; Defendant Speakman intended to assault Mr. Aden regardless of Mr. Aden's conduct.

169.    Defendant Speakman, like the other Law Enforcement Defendants, defined successful negotiation with Mr. Aden to be only and exclusively a complete and immediate surrender and assaulted Mr. Aden when they did not immediately achieve that result.

170.    Defendant Speakman willfully ignored Mr. Aden's good faith conduct in substantially complying with the Law Enforcement Defendants' requests and pushed for violence against Mr. Aden because he saw Mr. Aden, a young, Black, Somali male, intrinsically as a threat.

171.    The Law Enforcement Defendants also did not solicit substantive input or recommendations from Officer Moseng or any other member of the negotiator team prior to electing to use violence against Mr. Aden.

172.    No member of the negotiation team recalled, when speaking with the BCA, that the Law Enforcement Defendants asked the negotiators how the negotiators perceived the progress of the negotiations or whether the negotiators believed that the situation could be peacefully resolved through further communications.

173.    The Law Enforcement Defendants did not solicit input or recommendations from the negotiators because the Law Enforcement Defendants did not engage Mr. Aden in good faith negotiations.

174.    The Law Enforcement Defendants did not solicit input or recommendations from the negotiators because the Law Enforcement Defendants used the negotiators only as a tool for the assault, as recalled by Detective Pederson.

175.    Detective Peterson stated in her interview with the BCA: "I kept being told, basically screamed at that he's got to move over, he's not moving over" and that the Law Enforcement Defendants were "begging" for the negotiators to get Mr. Aden to move farther away from the handgun.

31

176.    Detective Pederson, consistent with statements of other members of the negotiation team, further stated that the flashbangs exploded while they were still trying to work with Mr. Aden and that the assault "was surprising to us all."

177.    A supervisor of the negotiation team, Eagan Police Sergeant Jennifer Wegner, stated that she would have asked for negotiation assistance from the Burnsville Police Department had the situation lasted longer but ultimately did not seek such assistance because the Law Enforcement Defendants wanted instead to implement a tactical plan.

178.    In her statement to the BCA, Sergeant Wegner described the conduct of the Law Enforcement Defendants as focused on using force, rather than achieving a peaceful resolution.

179.    Contrary to the statements of Defendants New and Speakman, Officer Moseng stated that the negotiations might have been effective had he been given more time and a better outcome might have been achieved.[2]

---

[2] It must be noted that Officer Moseng is less than impartial.  Officer Moseng identified himself as "our union president."  On information and belief, Officer Moseng is the president of the Eagan Police Department chapter of the Law Enforcement Labor Services ("LELS") union, a labor union that advocates on behalf of police officers and provides legal representation when necessary.  Officer Moseng stated that immediately after the shooting he "switched roles" and began working to protect the officers.  Officer Moseng stated that immediately after the shooting he started identifying those individuals that discharged their weapons and began obtaining attorneys to represent them before the officers provided any statement to the BCA.  Officer Moseng further stated that he was in communication with an attorney from the LELS who was advising Officer Moseng on how to handle the aftermath of the shooting.

180.    Officer Tracy Harrell, Officer Moseng's partner, described Officer Moseng as visibly upset after the shooting because he believed that Officer Moseng "was under the impression that the negotiations were going good."

181.    Defendant New and the Law Enforcement Defendants not only lacked situational awareness, ascribed deadly motives to the benign actions of a young, Black, Somali male, and ignored the substantial progress of the negotiations, but they also authorized the assault despite, by Defendant New's own admission, that he knew that the negotiations had been conducted improperly and had, therefore, been rendered less effective.

182.    Defendant New described the negotiations as "disjointed to say the least" and observed that Officer Moseng repeatedly disengaged from Mr. Aden during the negotiations.

183.    Defendant New believed that the negotiations were being conducted so poorly that he was forced to instruct Officer Moseng to stop disengaging Mr. Aden.

184.    Defendant New further recognized that by repeatedly disengaging Mr. Aden, the Law Enforcement Defendants were unable to build the rapport that would permit the Law Enforcement Defendants to achieve their desired outcome.

185.    Yet, despite knowing that the negotiations were conducted ineffectively, that the negotiations had lasted little more than an hour, and that, despite all of this, the negotiations had produced very positive results,  Defendant New and the Law Enforcement Defendants elected to use violence rather than allow negotiations to produce a peaceful resolution.

186.   This conduct was contrary to the Law Enforcement Defendants' conduct in other, similar situations with individuals who were not Black and Somali.

187.   Moreover, none of the Supervising Defendants in their respective interviews with the BCA described any conversation relating to the formulation of the plan for the assault or making the decision to assault Mr. Aden wherein it was discussed if Mr. Aden was a victim of a crime, whether he was experiencing some form of crisis, or any other factors or background information relating to Mr. Aden.

188.   Additionally, the Law Enforcement Defendants failed to continually assess the situation and to take appropriate action to de-escalate the situation despite Mr. Aden's responsiveness to the Law Enforcement Defendants' communications and requests and the Law Enforcement Defendants knowledge of the relevant facts and circumstances.

189.   The Law Enforcement Defendants saw only a threat—a young, Black, Somali male—and willfully ignored Mr. Aden's conduct, the positive results of negotiations that had occurred in only an hour of communications, and the Law Enforcement Defendants' own conduct in preventing a peaceful resolution.

190.   The Law Enforcement Defendants saw a young, Black, Somali male and chose violence.

**The Law Enforcement Defendants Made No Meaningful Attempt to Gather Background Information on Mr. Aden because He was only a Threat—a Young, Black, Somali Male.**

191.   Seeing only a young, Black, Somali male, the Law Enforcement Defendants made no meaningful effort to obtain background information, or were grossly incompetent in their attempts to obtain background information, on Mr. Aden before launching the

assault, despite such information being directly relevant to the necessity of or risks involved with such an assault.

192.    Instead, the Law Enforcement Defendants chose violence and ignorance.

193.    The Law Enforcement Defendants responded to Mr. Aden with overwhelming, militarized force, fully containing Mr. Aden to the vacant, industrial parking lot.

194.    The area had been evacuated and no persons were expected to return to the industrial area for at least another eight to ten hours to report for work the following morning.

195.    Moreover, even had individuals returned to the area, the Law Enforcement Defendants had constructed roadblocks around the area that would prevent entry.

196.    As a result of the lack of civilians, the expectation that no civilians were likely to return to the area, and the secure perimeter around Mr. Aden, the Law Enforcement Defendants had the time necessary to investigate fully Mr. Aden and the risk he posed.

197.    The Law Enforcement Defendants had not only time to investigate Mr. Aden and the incident, but also the full resources of multiple police departments and county and state agencies at their disposal.

198.    Yet, despite such resources, the Law Enforcement Defendants gathered virtually no information on Mr. Aden from which they could assess, for example, the threat he posed, whether he was experiencing a mental health or behavioral crisis, or whether he was a victim of a particularly heinous crime.

199.    For example, Sergeant Wegner stated that, although she was charged with collecting background information, all that she learned about Mr. Aden was that he liked soccer and "something else" that she could not later recall.

200.    Defendant New, the ultimate authority on scene, stated that he never knew even the most basic information a law enforcement official could gather on an individual—whether Mr. Aden had a criminal history.

201.    Defendant New stated that he could not obtain a criminal history on Mr. Aden because he could not get a computer to work.

202.    Yet, Defendant New could have obtained a criminal history on Mr. Aden had any meaningful effort been made, given that he had the full resources of the Law Enforcement Defendants, including the resources of multiple jurisdictions, available to him.

203.    Defendant Yakovlev, a sergeant with the Burnsville Police Department who was central to developing and promoting the plan to attack Mr. Aden, stated that all he essentially knew about Mr. Aden was that Mr. Aden was of Somali descent.[3]

204.    The Law Enforcement Defendants likewise failed to gather any meaningful information on Mr. Aden despite having an immediate family member on scene; Mr. Aden's brother who was eagerly volunteering to help.

---

[3] In 2016, Defendant Yakovlev shot and killed a suspect as the suspect ran away from Defendant Yakovlev holding a knife.  In total, Defendant Yakovlev, as well as another officer from the Burnsville Police Department, fired 23 rounds at the suspect, striking him 15 times, mostly in the back.  Moreover, a round fired by the officers also struck the vehicle of a bystander, while the vehicle was occupied by such bystander.

205. Mr. Aden's brother also had Mr. Aden's sister on the telephone via FaceTime, who likewise tried to communicate with the Law Enforcement Defendants and assist.

206. The Law Enforcement Defendants largely ignored Mr. Aden's family.

207. For example, Detective Darrin Schultz from the Eagan Police Department and Officer Harrell, members of the negotiation team, met with Mr. Aden's brother at the scene and ultimately told him that they "think we have what we need" and that "we don't need you right now."

208. Both Mr. Aden's brother and sister begged to be allowed to speak to their brother and repeatedly told the Law Enforcement Defendants that they could help the situation resolve peacefully.

209. The Law Enforcement Defendants refused the siblings' offers.

210. Instead, Detective Shultz and/or Officer Harrell told Mr. Aden's siblings that Mr. Aden did not have any hostages and presented no threat.

211. Because Mr. Aden presented no threat, Detective Schultz and/or Officer Harrell told Mr. Aden's siblings that the Law Enforcement Defendants were prepared to wait the situation out and give Mr. Aden all the time he needed to surrender, even if that meant allowing the situation to continue into the following morning.

212. Detective Pederson stated that she also spoke with Mr. Aden's siblings on the telephone early in the incident and that Mr. Aden's siblings were upset and could not understand what was happening.

213.    Panicked, the siblings were unable to immediately provide information but repeatedly requested to come to the scene.

214.    Detective Pederson instructed the siblings to stay away.

215.    Detective Pederson was also able to confirm that the handgun in Mr. Aden's possession was a small caliber 9mm Smith and Wesson.

216.    Detective Pederson thereafter made no further attempts to speak with Mr. Aden's family.

217.    Officer Moseng indicated that he had wished to use Mr. Aden's siblings to connect with Mr. Aden, yet that never occurred.

218.    Indeed, it does not appear that Officer Moseng ever received any significant information on Mr. Aden, including any information regarding his criminal history or background.

219.    Rather than utilize Mr. Aden's family as third-party intermediaries to connect with Mr. Aden and cause a peaceful resolution, the Law Enforcement Defendants contacted an individual that they described as being well-connected in the Somali community.

220.    Mr. Aden's family did not know this individual, however.

221.    Rather than use Mr. Aden's family, the Law Enforcement Defendants elected to introduce a stranger to the situation.

222.    Not only did the Law Enforcement Defendants elect to introduce a stranger, the Law Enforcement Defendants failed to investigate whether this stranger may introduce conflict into the situation including, for example, by first determining whether this stranger was a member of a Somali clan responsible for the murder of Mr. Aden's parents.

223. Again, prior to launching the assault, the Law Enforcement Defendants were aware that Ms. Asnake had clarified her prior statements and notified the Law Enforcement Defendants that Mr. Aden did not threaten her with the weapon.

224. The Law Enforcement Defendants further knew prior to shooting and killing Mr. Aden that the argument between Mr. Aden and Ms. Asnake arose out of the alleged dissemination of explicit photographs of Mr. Aden; an offense against Mr. Aden that would traumatize and greatly upset any reasonable individual, especially given Mr. Aden's Somali culture and background and Muslim faith.

225. Had the Law Enforcement Defendants bothered to collect background information, the Law Enforcement Defendants would have learned that Mr. Aden did not have a propensity for or history of violence, had no criminal history, did not suffer from any mental illness but may have been experiencing a crisis, and that Mr. Aden was an educated, successful person, known throughout his community as a leader and a person of good judgment and moral character.

226. Had the Law Enforcement Defendants bothered to appropriately investigate Mr. Aden, the Law Enforcement Defendants would have known that the risk posed by Mr. Aden was relatively low and the risk accompanying further negotiations was grossly disproportionate to the risk posed by an assault.

227. The Law Enforcement Defendants chose to act in ignorance, despite having enormous resources at their disposal, having detained Mr. Aden's girlfriend, and having Mr. Aden's immediate family members on scene and pleading to help.

228.    Mr. Aden was simply not worth the effort to the Law Enforcement Defendants; he was only a threatening young, black, Somali male that deserve to be dealt with only through violence.

**The Law Enforcement Defendants Elected to Assault Mr. Aden Based on Convenience rather than an Immediate Threat.**

229.    Immediately prior to the assault, Mr. Aden remained surrounded by two perimeters, comprised of, at a minimum, dozens of armed and armored SWAT team members and officers, four snipers, three K-9 units, and multiple armored vehicles, as well as industrial fencing.

230.    The Law Enforcement Defendants claimed justified use of force against Mr. Aden for essentially two reasons.

231.    First, the Law Enforcement Defendants believed that Mr. Aden was non-compliant with their commands and that the one-hour negotiations failed to produce positive results.

232.    This was, in fact, not true; Mr. Aden had substantially complied with the Law Enforcement Defendants' requests by, for instance, continually engaging in communications and agreeing to place the handgun on the ground and not touch it.

233.    Second, the Law Enforcement Defendants believed that the containment of Mr. Aden was insufficient, and that Mr. Aden could escape.

234.    The Law Enforcement Defendants unreasonably and irrationally feared that Mr. Aden would simply stand up and walk out of the inner and outer perimeter, despite the area being fully illuminated, the dozens of heavily armed and armored officers, and their

plan to subdue Mr. Aden with no less than three K-9 units, who each had their own lethal backup, and less-than-lethal weapons.

235.    At the time of the assault, Mr. Aden remained sitting on the curb in the vacant parking lot illuminated by spotlights, the area had been evacuated, the gun continued to sit on the ground where it had sat for the prior hour and a half, Mr. Aden continued to communicate with Officer Moseng on the telephone, Mr. Aden had made no threat nor had pointed the weapon towards any officer, and Mr. Aden had made no attempt to flee.

236.    Moreover, at the time of the assault, Mr. Aden sat directly in front of a bank of gas meters, presenting a serious risk of fire or explosion should the Law Enforcement Defendants elect to fire their weapons on Mr. Aden.

237.    In reality, the use of force was pre-determined and the idea of successful negotiations dismissed almost immediately.

238.    Sergeant Ondrey, who witnessed discussions of the Supervising Defendants relating to the assault plan, recalled to the BCA that the only options discussed were either to attack Mr. Aden or "continue to, to um talk with this guy [but] how long you know are we gonna let this go?"

239.    The Law Enforcement Defendants' use of force against Mr. Aden was not based on an immediate threat or a flight, but rather was a convenient means to put an end to the standoff with an individual whose life they valued less than the police canines.

240.    The Law Enforcement Defendants knew that Mr. Aden was fully contained and that the possibility of escape virtually non-existent.

241.   Indeed, early in the encounter, the Law Enforcement Defendants discussed at what point the third K-9 unit, Officer Andrew Helgerson of the Eagan Police Department, should deploy his dog if Mr. Aden tried to run and, in response, a SWAT team operator indicated that it was no concern because Mr. Aden "won't make it that far."

**The Law Enforcement Defendants Assaulted and Killed Mr. Aden Despite the Less Lethal Weapons Achieving the Desired Effect of Causing a Surrender.**

242.   The video recordings of the assault conclusively show that Mr. Aden was attempting to surrender by sitting down and raising his empty left hand into the air while putting the handgun on the ground when the Law Enforcement Defendants opened fire upon him, striking him with lethal rounds no less than 11 times.

243.   Figure A, below, approximates some, but not all, of the positions of the Law Enforcement Defendants and their assets in the inner perimeter at the time of the shooting.[4]

---

[4] The Estate created and presents Figure A herein for illustrative purposes only. Although the Estate has taken great care in creating Figure A as accurately as possible based on the video and images available, Figure A may not be to scale or perfectly represent the positions or locations of the Law Enforcement Defendants or their vehicles.

Fig. A



244.    Defendant Bloomington's Bearcat armored vehicle was positioned at approximately a two o'clock position from Mr. Aden (in front and slightly to Mr. Aden's right) and six SWAT team members from the Bloomington Police Department were in or near Defendant Bloomington's Bearcat: Sergeant Christopher Yates, Officers Scott Sager, Matthew Ryan, Jacob Lucas, and Ryan Arbuckle, and medic Patrick Sweany.

245.    All officers on or near Defendant Bloomington's Bearcat are white males.

246.    Defendant Edina's Bearcat armored vehicle was positioned at approximately a ten o'clock position from Mr. Aden (in front and slightly to Mr. Aden's left) and five SWAT team members from the Edina and Eagan Police Departments were in or near the Edina Bearcat: Edina Officers Chad Anderson and Ryan Schultz and Eagan Officers Eric Tessmer, Jacob Peterson, and Tony Sundgaard.

247.    All officers on or near Defendant Edina's Bearcat are white males.

248.    Defendant Dakota's MRAP was positioned at approximately an eight o'clock position from Mr. Aden (to Mr. Aden's left and slightly behind) and five SWAT team members were in or near the MRAP: Dakota County Sheriff's detective Sean Qualy and Bloomington Officers Jeremy Pilcher, Jacob Gruber, Daniel Nelson, and Michael Smith.

249.    All officers on or near Defendant Dakota's MRAP are white males.

250.    A squad car belonging to Defendant Eagan was at approximately a nine o'clock position from Mr. Aden (directly to Mr. Aden's left) and two officers from the Bloomington Police Department were in or near the squad car, moving among the squad car and MRAP: Officer Nick Melser and K-9 Officer Mike Perron.

251.    Officer Melser and Officer Perron are both white males.

252.    An SUV belonging to the Minnesota State Patrol was positioned at approximately a seven o'clock position from Mr. Aden (behind and to Mr. Aden's left) and two SWAT team members from the Bloomington Police Department were in or near the SUV: Officer Eric Bengston and K-9 Officer Mike Vonderharr.

253.    Officer Bengston and Officer Vonderharr are both white males.

254.    Two Bloomington Police Department SWAT team snipers were positioned on a rooftop across the street from Mr. Aden at an approximately 10 o'clock position (in front and to Mr. Aden's left): Officers Adam Stier and Anthony Kiehl. Two additional SWAT team snipers, Officers Chad Clausen and Kyle Posthumus from the Eagan and Burnsville Police Departments respectively, were positioned in the grass at approximately an 11 o'clock position from Mr. Aden (directly in front of Mr. Aden).

255.    Officers Stier, Kiehl, Clausen, and Posthumus are all white males.

256.    On information and belief, a third K-9 unit was positioned directly to Mr. Aden's west and additional officers were positioned immediately to the other side of the industrial fence.

257.    At the time of the assault, the handgun remained sitting on the ground approximately a foot and a half from Mr. Aden's right foot.

258.    The assault plan called for the deployment of three flashbang explosive devices in front of Mr. Aden as a distraction and then the firing of less lethal rounds from Mr. Aden's direct left, from the Dakota MRAP and Eagan squad car.

259.    The Law Enforcement Defendants elected to use less lethal rounds against Mr. Aden even though Mr. Aden was sitting on the ground and the rounds presented a significantly increased the risk that the less lethal would strike the head or neck.

260.    The Law Enforcement Defendants unreasonably assumed that Mr. Aden would immediately surrender without moving towards the gun after being struck by the less-than-lethal rounds because of the pain such rounds would inflict.

261. After the firing of the less lethal, a reaction team was to approach and secure Mr. Aden.

262. At 10:38 p.m., the Law Enforcement Defendants assaulted Mr. Aden.

263. The assault was recorded by multiple audio and video recording devices.

264. Immediately before the attack, Mr. Aden continued to sit on the curb, talking on the telephone with Officer Moseng and the handgun remained sitting on the ground near Mr. Aden's right foot.

265. The assault began with the deployment of a flashbang from the Bloomington Bearcat, which exploded in front of Mr. Aden and slightly to his right, causing Mr. Aden to duck his head and look to his right.

266. One or more officers directly to Mr. Aden's left thereafter immediately fired less lethal rounds, striking Mr. Aden's left abdomen, just above his left hip, causing Mr. Aden to reactively turn his body to his right to protect himself.

267. As Mr. Aden turned, but before Mr. Aden's buttocks rose more than two inches off the curb, a second flashbang detonated but, unlike the first, this flashbang exploded in close proximity to Mr. Aden, sending shrapnel flying towards Mr. Aden and causing him to stumble back and to his right towards the gun.

268. As Mr. Aden stumbled, Mr. Aden's right hand fell to the ground near the gun for balance, as also recalled by one or more officers on scene, and, as Mr. Aden attempted to recover, he picked up the handgun and continued to move away from the Law Enforcement Defendants and incoming rounds to the northeast along the curb.

269.    At no time did Mr. Aden raise or present the handgun or point the handgun in the direction of any Law Enforcement Defendants as he attempted to avoid the incoming rounds.

270.    At all times Mr. Aden pointed the handgun down and away from the Law Enforcement Defendants.

271.    A third flashbang thereafter detonated near the first.

272.    Mr. Aden quickly moved to sit down in the grass by placing his right hand— the hand that held the handgun—and right knee on the ground and turning his back towards the Law Enforcement Defendants positioned near the Edina Bearcat, the MRAP, SUV, squad car, and snipers on the rooftop.

273.    While sitting down on the grass, Mr. Aden raised his empty left hand and lowered his head towards the ground, signaling his surrender.

274.    The Law Enforcement Defendants had not fired any lethal rounds at the time Mr. Aden sat in the grass, lowered his head, and raised his left hand.

275.    Figure B is a still image taken from video recorded by the Minnesota state patrol SUV identified in Figure A and shows Mr. Aden's position prior to the firing of lethal rounds by the Law Enforcement Defendants.

Fig. B



276.   After Mr. Aden sat on the ground, lowered his head, and raised his left hand to surrender, an officer can be heard yelling: "He's got the gun."

277.   The statement "He's got the gun" can be distinctly and clearly heard well after Mr. Aden placed the gun on the ground and raised his left hand, as shown in Fig. B.

278.   At the time the officer yelled "He's got the gun," all Law Enforcement Defendants remained fully protected behind their respective armored vehicles.

279.   After the officer yelled, "He's got the gun," five officers fired multiple lethal rounds at Mr. Aden, striking him no less than 11 times.

280. The officers that fired lethal rounds are SWAT officers Nelson, Peterson, and Ryan and SWAT snipers, Kiehl and Stier.

281. After being struck by the initial lethal rounds, Mr. Aden lied on the ground while the Law Enforcement Defendants continue to fire lethal rounds.

282. SWAT snipers Kiehl and Stier fired their weapons 2 seconds and 4 seconds after the other officers that fired lethal rounds ceased firing and while Mr. Aden lied wounded on the grass.

283. The Law Enforcement Defendants did not approach Mr. Aden for approximately six minutes, permitting him to lie on the ground and bleed out.

284. When the Law Enforcement Defendants finally did approach, they casually stood over Mr. Aden for approximately one minute without rendering any form of aid.

285. After the Law Enforcement Defendants stood over Mr. Aden for approximately one minute without rendering medical aid, the Law Enforcement Defendants rolled Mr. Aden on to his stomach, handcuffed him, and dragged him away.

286. It took roughly ten minutes to transport Mr. Aden to a nearby ambulance.

287. Officer Josh Siefert, a SWAT team leader positioned behind the MRAP on Mr. Aden's left, stated to the BCA that "once he went down there was a bit of a lull in the in that it was just quiet for a second. Um, and I think I remember saying get that bearcat up there just to, just to check on his status."

288. Officer Seifert said, "I just kinda yelled it . . . um and then nothing happened. I'm like suspect get your hands up and I do remember uh the suspect raising one of his hands in the air."

289.    Yet, the Law Enforcement Defendants waited more than seven minutes before approaching and handcuffing Mr. Aden.

290.    An autopsy revealed that Mr. Aden had been struck by lethal rounds no less than 11 times, including in the back and his left hand and arm that was raised in surrender.

291.    Mr. Aden was struck by lethal rounds to the arms, chest, back, legs, and foot.

**The Assault Forced Mr. Aden to Move Towards the Gun and the Law Enforcement Defendants Shot Him Even Though He Reacted Predictably and Despite Posing No Immediate Threat When Shot or for Hours Beforehand.**

292.    The Law Enforcement Defendants purportedly designed the assault plan for the purpose of causing Mr. Aden to surrender. In that regard, the assault was successful because Mr. Aden did, in fact, attempt to surrender.

293.    But, rather than allow or permit Mr. Aden opportunity to surrender, the Law Enforcement Defendants killed him.

294.    The Law Enforcement Defendants fired lethal rounds before evaluating whether the less lethal rounds had the intended effect of causing a surrender.

295.    At all times, prior to firing their lethal weapons, the Law Enforcement Defendants remained shielded and protected behind their armored vehicles, body armor, and/or armored shields.

296.    It is not clear, however, how the Law Enforcement Defendants anticipated that Mr. Aden would surrender.

297.    In fact, the Law Enforcement Defendants appear to have completely failed to discuss or anticipate how Mr. Aden would react or what types of movement Mr. Aden may make after being struck by incoming rounds and explosions.

298.   Nor did they develop any plan details to approach and apprehend Mr. Aden.

299.   The Law Enforcement Defendants did know, however, that the handgun remained on the ground to Mr. Aden's right and yet devised and executed an assault plan that called for exploding flashbang grenades directly in front of Mr. Aden and the shooting of painful, less than lethal rounds directly from Mr. Aden's left.

300.   As a result of the plan as devised by the Law Enforcement Defendants, the only direction from which Mr. Aden was not assaulted was to Mr. Aden's right, where the gun was located.

301.   It is unreasonable, therefore, that the Law Enforcement Defendants did not expect or could not reasonably foresee that Mr. Aden would move to his right—the only direction free of explosions and incoming rounds.

302.   Indeed, Officer Vonderharr of the Bloomington Police Department remarked prior to the shooting of Mr. Aden that "it just sucks. Those [less lethal rounds] are probably going to push him towards that gun."

303.   Officer Vonderharr further commented that the assault and situation was going to be "a shit show."

304.   Officer Vonderharr, like the Law Enforcement Defendants, was aware that the assault plan was poorly conceived and would push Mr. Aden towards the gun.

305.   Officer Josh Siefert, a SWAT team leader, observed the assault while standing behind the MRAP to Mr. Aden's left.

306.   In his interview with the BCA, Officer Siefert described Mr. Aden as turning his back to the Law Enforcement Defendants and putting his right hand down for balance.

307.    Officer Siefert further stated that the lethal rounds were fired so quickly that the flashbangs, less lethal rounds, and lethal rounds were a single "burst of sound" and that he did not learn lethal rounds were fired until after the shooting concluded.

308.    Indeed, the firing of lethal rounds happened so quickly that the K-9's were not released.

309.    Other SWAT team members, including Officer Tony Sungaard, indicated to the BCA that the flashbangs shocked Mr. Aden, causing him to turn his body and raise his left hand to protect himself from the incoming rounds and explosions.

310.    Yet, when Mr. Aden did move to his right and turn his back to the Law Enforcement Defendants, the Law Enforcement Defendants opened fire upon him.

311.    Again, Mr. Aden did not move towards the Law Enforcement Defendants who were to the northwest, but rather moved towards the northeast towards relative safety, and did not raise or present the weapon in the direction of the Law Enforcement Defendants.

312.    Again, the Law Enforcement Defendants, at the time they elected to use deadly force against Mr. Aden, remained shielded behind their armored vehicles, ballistic shields, and body armor.

313.    Mr. Aden and his movement presented no immediate threat.  Indeed, Mr. Aden acted predictably.

314.    The Law Enforcement Defendants' election to use force was also contrary to the Law Enforcement Defendants' own policies and procedures, including that policies clearly stating that the use of force is a last resort and should be avoided when a situation

can be de-escalated by other means, should be used only when immediately necessary, and that the degree of force should be only that which is necessary to bring an incident under control.

315.    At the time of the assault, Mr. Aden was under control.

316.    The election to use deadly force against Mr. Aden despite the absence of an immediate threat and his predictable reaction is particularly egregious given that the Law Enforcement Defendants had surrounded Mr. Aden with elite, specially trained SWAT team operators, whose central duty is life saving and to operate with skill, knowledge, and restraint in the face of potential danger.

317.    SWAT team members, as the elite force of the Law Enforcement Defendants, receive specialized, intensive training and are to be held to a higher standard than a typical patrol officer.

318.    It is wholly unreasonable and astounding that such SWAT team operators would open fire upon Mr. Aden, given that the officers were adequately protected, Mr. Aden moved away from the officers, Mr. Aden reacted predictably, and Mr. Aden never raised the weapon at all, let alone in the direction of the officers.

**The Law Enforcement Defendants Permitted and Sanctioned Warrior Style Training, including by Permitting its Officers to Attend Seminars on "Killology" which Teaches Law Enforcement Officers How to be "Predators" and "Killers."**

319.    On information and belief, one or more Law Enforcement Defendants and/or officers responding to Mr. Aden attended seminars and courses designed to teach law enforcement officers how to kill and how to be prepared to kill, including, but not

necessarily limited to, courses on the "Killology" philosophy taught by David Grossman and his company, Grossman Academy.

320.    Grossman, like others, teaches a fear-based approach to policing, instructing law enforcement officers to view all situations as inherently dangerous and encouraging officers not to hesitate to use deadly force.

321.    Such warrior-style training emphasizes to law enforcement officers that suspects are predators who are always looking for soft targets and body counts.

322.    The training also emphasizes that all suspects give pre-attack indicators, such as target glancing and scanning a scene, a lack of eye contact, a lack of dramatic movement, hands to the face, or the "felony stretch" (where a suspect stretches his or her arms while looking around).

323.    Based on this training, an officer that observes such conduct should be on heightened alert for a deadly attack.

324.    Indeed, the Law Enforcement Defendants, including Defendant New, commented that Mr. Aden's act of looking around constituted a threat to use deadly violence and indicated that he was preparing to flee or attack.

325.    The Law Enforcement Defendants repeatedly referred to Mr. Aden's act of putting his hands to his head or moving slightly back and forth on the curb and the Law Enforcement Defendants, including Defendants Kiehl and Stier, repeatedly stated that Mr. Aden's act of switching the phone from the right hand to the left hand was a pre-attack indicator.

326. However, Officer Moseng recalled Mr. Aden stating that he was no longer interested in the gun and that Mr. Aden would only move towards the gun, but not touch it, when the Law Enforcement Defendants began mustering for an assault and moving personnel around the scene.

327. With the approval of his superior officer, Defendant Yakovlev attended the two-day course "Bulletproof Mind: Mental Preparation for Combat" presented by Grossman.

328. This two-day course was presented as a "recipe for ensuring that your mind is mentally prepared for combat encounters" and covered topics such as "Surviving Gunshot Wounds," "Dreaming that Our Firearms Don't Work," "Combat Preparation for Your Spouse," "Asymmetrical Warfare," and "The Killing Enabling Process."

329. In Grossman's Bulletproof Warrior training, Grossman teaches law enforcement officers that killing is an acceptable police practice and justifies such conduct by citing to various Bible verses, rationalizing that a law enforcement officer's killing of a suspect is not prohibited or encompassed by, for example, the commandments in Exodus 20:13 that "Thou Shalt not murder" and Matthew 19:18 that "Thou Shalt do no murder."

330. The Law Enforcement Defendants sanctioned, authorized, and adopted the Killology and other warrior-style philosophies by permitting their officers to attend Grossman's and other similar seminars and by adopting a warrior-style mentality to policing that promotes violence.

331. As a result of this philosophy and training, the Law Enforcement Defendants approached Mr. Aden with a combat mentality and equipped with combat-grade

equipment, viewed him inherently as a threat despite his compliant, non-threatening conduct, failed to engage in good faith negotiations, and elected to use violence unnecessarily.

**The Officers that Shot Lethal Rounds Give Varying, Contradictory Accounts of Mr. Aden's Actions and Conduct and Justifications for the Use of Lethal Force.**

332.    Five officers fired lethal rounds at Mr. Aden, striking him at least 11 times; Defendants Ryan, Nelson, Peterson, Stier, and Kiehl.

333.    Just as the negotiators were not consulted regarding the need for an assault, the assaulters generally were not apprised of the status of negotiations or Mr. Aden's compliance, with the exception of Defendant Ryan who recalled that Mr. Aden made significant efforts at complying with the Law Enforcement Defendants.

*Defendant Ryan*

334.    Defendant Ryan was positioned in the Bloomington Bearcat directly in front of Mr. Aden.

335.    Defendant Ryan, in his BCA interview, stated that, after the explosions of the flashbangs and firing of less lethal rounds, he observed Mr. Aden try to protect himself and turn his back to the Law Enforcement Defendants before being shot.

336.    Defendant Ryan stated that after arriving he and his team members "were coordinating to make sure that the perimeter was now secure" and that they ultimately obtained "360 degree coverage[.]"

337.    Defendant Ryan never observed Mr. Aden pick up the gun, attempt to pick up the handgun, or even touch the handgun prior to the assault.

338.    Defendant Ryan believed that the negotiations were productive, resulting in Mr. Aden making "significant movement away from the firearm."

339.    When asked by the BCA why he believed an assault on Mr. Aden was necessary at that moment, Defendant Ryan could only reply, "I don't know."

340.    Defendant Ryan's description of the shooting largely reflects that which was recorded on video.

341.    Defendant Ryan stated that after the explosions of the flashbangs, Mr. Aden attempted to cover his head and attempted to move to the northeast along the curb upon which he was sitting.

342.    Defendant Ryan stated to the BCA that he believed Mr. Aden turned to the northeast "just to get away from . . . maybe the 40 millimeter rounds that were coming from the south, he, he just, I guess his body just gradually went to the north[.]"

343.    Although Defendant Ryan admitted that Mr. Aden turned his head and body to the northeast—away from the Law Enforcement Defendants—and covered his head, Defendant Ryan claimed that Mr. Aden pointed the handgun to the south, behind him, towards the Edina Bearcat.

344.    Defendant Ryan stated that Mr. Aden "had the gun at his mid-waistline and he was pointing it primarily at . . . more so where the Edina Bearcat had been staged[.]'

345.    The audio and/or video recordings disprove that Mr. Aden raised the gun to his mid-waistline or that he pointed it towards any Law Enforcement Defendants.

346.    Defendant Ryan admitted, however, that Mr. Aden did not point the weapon in his direction next to the Bloomington Bearcat.

347.   Defendant Ryan then heard someone yell that Mr. Aden had the handgun and, after hearing such, began firing.

348.   Defendant Ryan stated he fired two to three rounds before his gun jammed, preventing him from firing more rounds at Mr. Aden.

**Defendant Nelson**

349.   Defendant Nelson was positioned near Defendant Dakota's MRAP—behind and to the left of Mr. Aden.

350.   Defendant Nelson stated that he imagined how Mr. Aden would react when hit by less lethal rounds.

351.   Defendant Nelson stated to the BCA that he was "shocked" that less lethal rounds fired from behind and to the left of Mr. Aden caused Mr. Aden to move forward and to the right instead of causing Mr. Aden to fall backwards.

352.   According to Defendant Nelson, upon being hit, Mr. Aden "lunged forwards and to the right, so I actually saw him turn and saw his back exposed" and that this reaction "shocked" Defendant Nelson causing him to conclude that "this is not how this is gonna go down" and therefore he "focused on getting my red dot on a body part of his[.]"

353.   Defendant Nelson admitted that his view of the handgun was fully obstructed and that, after the explosions of the flashbangs and firing of less lethal rounds, Mr. Aden turned his back to Defendant Nelson and began moving in the opposite direction.

354.   Based on Mr. Aden's movement, Defendant Nelson determined that Mr. Aden was "gonna try and kill people" while contemporaneously fearing that Mr. Aden

would "turn [around] and run towards us 'cuz we're the closest escape avenue.  And start shooting people as he runs by.  And I was like, oh, you need to shoot him."

355.    Defendant Nelson also stated that he assumed Mr. Aden was firing the weapon prior or contemporaneously to Defendant Nelson shooting Mr. Aden, although he admits that he could not tell who was doing the firing.

356.    Defendant Nelson stated "I didn't know at the time whether he picked the gun up and just started popping rounds off or if it was the less lethal 'cuz there was also flash bangs that were being thrown . . . And so I heard booms.  I couldn't tell if it was specifically from him.  I thought it could have been from him as well."

***Defendant Peterson***

357.    Defendant Peterson[5] was in the gun turret of the Edina Bearcat, to the left of Mr. Aden, at the time the Law Enforcement Defendants shot and killed Mr. Aden.

358.    Contrary to the video recordings and statements by other Law Enforcement Defendants, Defendant Peterson stated in his BCA interview that Mr. Aden raised the handgun and pointed it forwards, at the Bloomington Bearcat, rather than backwards as recalled by Defendant Ryan.

359.    Defendant Peterson stated that "quite simultaneous" to the deployment of the flashbang, Mr. Aden "jumped up from his seated position."

---

[5]  Defendant Peterson shot and killed Zachary Premo in 2013 in Duluth, Minnesota, after attempting to detain Mr. Premo for allegedly driving while intoxicated.

360.    The video recordings of the shooting, however, clearly show that Mr. Aden never raised the weapon nor pointed it in the direction of any Law Enforcement Defendants, either by pointing it to the northwest as claimed by Defendant Peterson or to the south as claimed by Defendant Ryan.

**Defendants Stier and Kiehl**

361.    Defendants Stier and Kiehl[6] were snipers positioned on the rooftop across the street from Mr. Aden.

362.    Both Defendants Stier and Kiehl admitted in their interviews with the BCA that they fired their weapons only after they saw Mr. Aden being hit by lethal rounds and collapsing to the ground.

363.    Defendant Stier stated that he saw less lethal rounds fired at Mr. Aden from Mr. Aden's right side.

364.    However, no officers were positioned immediately to Mr. Aden's right and all less lethal rounds were fired from Mr. Aden's left.

365.    Yet, under the belief that the Law Enforcement Defendants were firing upon Mr. Aden from the right, Defendant Stier concluded that Mr. Aden "made a very conscious decision to fight through [the incoming rounds] and get to the gun."

366.    Neither Defendant Stier nor Defendant Kiehl knew how the Law Enforcement Defendants intended to assault Mr. Aden prior to execution of the assault.

---

[6] Defendant Kiehl shot and killed Quincy Reindl in 2015, when Defendant Kiehl encountered Mr. Reindl holding a gun to his own head.  Officer Perron was also involved in that shooting death.

367.    Defendant Stier stated he and Defendant Kiehl "knew there was some kind of action plan" and that "as soon as they said execute, we knew now an offensive action was going to be taking place to try and take him into custody."

368.    Defendant Stier stated: "I was trying to track him in my scope and get back on target.  Um, as I was doing that I heard the shots, I heard somebody yell, he's got the gun.  It appeared to me that he staggered and started to, to, like he was going down as if he had been hit by the initial gun fire.  Um, but he still had his arm extended and still appeared to have his, the gun in his hand uh, and at that point is when I fired one round.  And, the male ended up going down, um, right at that spot."

369.    As evidenced by the video recordings, Mr. Aden only extended his empty left hand to surrender and thereafter raised his hand when instructed by the Law Enforcement Defendants.

370.    Defendant Kiehl stated, contrary to the video recordings and statements by other officers, that he observed Mr. Aden deliberately move towards the Bloomington Bearcat and raise and point the weapon at the Law Enforcement Defendants positioned near that armored vehicle.

371.    Defendant Kiehl stated that Mr. Aden "grabs the gun for sure.  Um points it and he goes right towards the bearcat."

372.    Defendant Kiehl further states that he believes he saw Mr. Aden fire the weapon at the officers near the Bloomington Bearcat.

373.    Defendant Kiehl stated: "I saw a muzzle flash um from that handgun, could have been a reflection um goes right to the Bearcat."

374.    As evidenced by the video recordings, none of this occurred.

375.    Defendant Kiehl stated "some rounds get fired and he starts to stagger down towards the steps of that building he was sitting by.  Um, and as he's falling, staggering away, um I shot."

376.    Defendants Stier and Kiehl can be heard firing their weapons 2 to 4 seconds after the other Law Enforcement Defendants ceased firing upon Mr. Aden.

377.    This conduct was unjustified and unreasonable under the circumstances.

378.    Defendants Ryan, Nelson, Peterson, Stier, and Kiehl, as members of specially trained and elite SWAT team units, knew or reasonably should have known that Mr. Aden did not present a threat, immediate or otherwise, to the Law Enforcement Defendants and should have acted with the restraint expected and required of SWAT team members.

379.    Defendants Ryan, Nelson, Peterson, Stier, and Kiehl, as members of specially trained and elite SWAT team units, understood that by using deadly force against Mr. Aden without justification, they violated Mr. Aden's rights to life, liberty, and due process of the law.

380.    By using such force without justification, Defendants Ryan, Nelson, Steir, and Kiehl violated Mr. Aden's constitutional rights.

## COUNT I

**Deadly Force / Unreasonable Search and Seizure**
**Fourth Amendment, 42 U.S.C. §§ 1983 and 1988, and Article I, §§ 2, 10 of the**
**Constitution of the State of Minnesota**
**(Against the Lethal Force Defendants, as Individuals)**

381.     The Estate realleges and incorporates by reference each and every preceding

paragraph as if stated in full herein.

382.     The Fourth Amendment to the United State Constitution and Article I,

sections 2 and 10 of the Minnesota Constitution provide that citizens are to be free from

excessive force and unreasonable search and seizures.

383.     Title 42 U.S.C. § 1983 prohibits, *inter alia*, state actors from depriving

citizens of rights, privileges, or immunities secured by the United States Constitution and

Minnesota Constitution, including the right to life, liberty and to be free from excessive

force and unreasonable search and seizures as guaranteed by the Fourth Amendment and

incorporated through the Fourteenth Amendment and sections 2 and 10 of the Minnesota

Constitution.  The rights were clearly established at all times relevant to this Complaint.

384.     In violation of 42 U.S.C. § 1983, the Lethal Force Defendants, acting under

color of state law, deprived Mr. Aden of rights, privileges, and immunities secured by the

United States Constitution and Minnesota Constitution by using excessive, unreasonable,

and deadly force resulting in Mr. Aden's death by shooting and killing Mr. Aden as he

attempted to surrender and/or attempted to protect himself from the assault against his

person.

385.     At the time the Lethal Force Defendants shot and killed Mr. Aden, Mr. Aden

did not pose an immediate threat to the Law Enforcement Defendants.

386.    The Lethal Force Defendants' actions were not objectively reasonable and willful under the Fourth Amendment or under the Minnesota Constitution for the purposes of qualified and/or official immunity under the totality of the circumstances and as direct and proximate result of their actions, Mr. Aden, and thereby the estate, have been injured, suffering his wrongful death, physical, mental, and emotional pain, discomfort, embarrassment, fear, anxiety, and have been effected in other ways, including public scorn, and a generally diminished sense of personal safety, and for attorneys' fees and other costs associated with commencement of this lawsuit.

387.    Further Mr. Aden and the Estate have suffered pecuniary and other losses, including, but not limited to economic damages and a loss of Mr. Aden's aid, comfort, companionship, guidance, and protection.

388.    The Lethal Force Defendants, as a result of their outrageous and illegal behavior, are liable to the Estate for the aforementioned injuries and damages as well as punitive damages.

389.    Total damages suffered are in excess of $20,000,000.00, to be further determined at trial.

390.    Punitive damages are also properly awarded against Defendants and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the different standard of proof set forth in Minn. Stat. § 549.20.

## COUNT II
**Excessive Force / Unreasonable Search and Seizure
Fourth Amendment, 42 U.S.C. §§ 1983 and 1988, and Article I, §§ 2, 10 of the
Constitution of the State of Minnesota
(Against the Law Enforcement Defendants)**

391.    The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

392.    The Fourth Amendment to the United State Constitution and Article I, sections 2 and 10 of the Minnesota Constitution provide that citizens are to be free from excessive force and unreasonable search and seizures.

393.    Title 42 U.S.C. § 1983 prohibits, *inter alia*, state actors from depriving citizens of rights, privileges, or immunities secured by the United States Constitution and Minnesota Constitution, including the right to life, liberty and to be free from excessive force and unreasonable search and seizures as guaranteed by the Fourth Amendment and incorporated through the Fourteenth Amendment and sections 2 and 10 of the Minnesota Constitution.  The rights were clearly established at all times relevant to this Complaint.

394.    In violation of 42 U.S.C. § 1983, the Law Enforcement Defendants, acting under color of state law, deprived Mr. Aden of rights, privileges and immunities secured by the United States Constitution and Minnesota Constitution by using excessive and unreasonable force, ultimately resulting in Mr. Aden's death by assaulting Mr. Aden with less lethal munitions and explosives despite the Law Enforcement Defendants' knowledge that, for example, the assault would push Mr. Aden towards the weapon on the ground, that Mr. Aden complied with the Law Enforcement Defendants' request that he put the weapon on the ground and had not touched the weapon for approximately an hour and a half, that

Mr. Aden had not attempted to flee, that Mr. Aden continued in good faith to engage in negotiations with the Law Enforcement Defendants, and that Mr. Aden was himself likely the victim of a crime.

395.    The Lethal Force Defendants' actions were not objectively reasonable and willful under the Fourth Amendment or under the Minnesota Constitution for the purposes of qualified and/or official immunity under the totality of the circumstances and as direct and proximate result of their actions, Mr. Aden, and thereby the estate, have been injured, suffering his wrongful death, physical, mental, and emotional pain, discomfort, embarrassment, fear, anxiety, and have been effected in other ways, including public scorn, and a generally diminished sense of personal safety, and for attorneys' fees and other costs associated with commencement of this lawsuit.

396.    Further Mr. Aden and the Estate have suffered pecuniary and other losses, including, but not limited to economic damages and a loss of Mr. Aden's aid, comfort, companionship, guidance, and protection.

397.    The Lethal Force Defendants, as a result of their outrageous and illegal behavior, are liable to the Estate for the aforementioned injuries and damages as well as punitive damages.

398.    Total damages suffered are in excess of $20,000,000.00, to be further determined at trial.

399.    Punitive damages are also properly awarded against Defendants and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983),

and as such, are not subject to the pleading requirements or the different standard of proof set forth in Minn. Stat. § 549.20.

## COUNT III
### Denial of Medical Care
### Due Process and 42 U.S.C. §§ 1983 and 1988
### (Against the Law Enforcement Defendants)

400.    The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

401.    The Due Process Clause requires the provision of prompt medical care to "persons ... who have been injured while being apprehended by the police." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

402.    The Law Enforcement Defendants shot Mr. Aden 11 times.  Yet, the Law Enforcement Defendants waited nearly ten minutes after shooting Mr. Aden to provide him any form of medical care.

403.    For six minutes, the Law Enforcement Defendants refused to approach the motionless Mr. Aden.  After approaching the Law Enforcement Defendants stood over Mr. Aden talking, but not touching Mr. Aden.

404.    After another minute, the Law Enforcement Defendants rolled Mr. Aden on to his stomach and handcuffed him.

405.    As a direct and proximate cause of the Law Enforcement Defendants' failure to render medical care, Mr. Aden died.

406.    The conduct of the Law Enforcement Defendants has deprived Mr. Aden of the rights and liberties afforded to him by the United States and Minnesota Constitutions, causing the aforementioned damages and injuries to Mr. Aden and the Estate.

407.    The Law Enforcement Defendants, as a result of their outrageous and illegal behavior, are liable to the Estate for the aforementioned injuries and damages as well as punitive damages.

408.    Total damages suffered are in excess of $20,000,000.00, to be further determined at trial.

409.    Punitive damages are also properly awarded against Defendants and are hereby claimed as a matter of federal common law, <u>Smith v. Wade</u>, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the different standard of proof set forth in Minn. Stat. § 549.20.

**<u>COUNT IV</u>**
**Unjustified Decision to Use Deadly and Excessive Force**
**Substantive Due Process, 42 U.S.C. §§ 1983 and 1988**
**(Against the Supervising Defendants, as Individuals)**

410.    The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

411.    The Due Process Clause of the Fourteenth Amendment protects citizens from acts of the State.

412.    "The touchstone of due process is protection of the individual against arbitrary action of government." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1974).

413.     Substantive due process protects citizens from the "exercise of power without any reasonable justification." Id.

414.     The election by the Supervising Defendants to use violence against Mr. Aden is egregious and arbitrary, shocks the conscience, and was made with deliberate indifference to the rights of Mr. Aden, including his right to life and liberty.

415.     The Supervising Defendants use of violence against Mr. Aden placed Mr. Aden and the officers on scene at a grossly disproportionate and unreasonable risk of injury as compared to continued negotiations.

416.     The decision to use violence was made despite the Supervising Defendants having sufficient time to fully consider the potential consequences of their conduct and the availability of less intrusive means.

417.     The Supervising Defendants acted with conscious disregard to the risks created and/or increased by the assault and with full knowledge that Mr. Aden did not and had not presented an immediate risk of danger at any time through the course of the Law Enforcement Defendants' interactions with Mr. Aden.

418.     The Constitution does not permit the Supervising Defendants to take any risk deemed expedient, to make hasty decisions to use force, or to create an immediate risk of injury where none currently exists.

419.     The Supervising Defendants acted with conscious disregard of the risk to Mr. Aden and, as a direct and proximate cause of that disregard, the Supervising Defendants deprived Mr. Aden of his life and liberty without reasonable justification.

420.     As a result of the Supervising Defendants conscious disregard, Mr. Aden and the Estate have suffered the aforementioned injuries.

421.     The Supervising Defendants, as a result of their outrageous and illegal behavior, are liable to the Estate for the aforementioned injuries and damages as well as punitive damages.

422.     Total damages suffered are in excess of $20,000,000.00, to be further determined at trial.

423.     Punitive damages are also properly awarded against Supervising Defendants and are hereby claimed as a matter of federal common law, Smith v. Wade, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the different standard of proof set forth in Minn. Stat. § 549.20.

**COUNT V**
**Wrongful Death**
**Minn. Stat. § 573.02**
**(Against the Law Enforcement Defendants)**

424.     The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

425.     Minn. Stat. § 573.02 affords a cause of action to Mr. Aden's estate when a death is caused by a wrongful act or omission of any person or corporation.

426.     The use of deadly force by the Law Enforcement Defendants was extreme, outrageous, and totally unwarranted under the totality of the circumstances.

427.    The Law Enforcement Defendants' wrongful acts and omissions constitute wrongful conduct resulting in the wrongful death of Mr. Aden for which Minn. Stat. § 573.02 allows recovery.

428.    As a direct and proximate cause of the Law Enforcement Defendants' actions, the Mr. Aden and the Estate, Mr. Aden, and his heirs and next-of-kin have been injured, as a result of this wrongful death in the same ways as delineated above.

429.    The Law Enforcement Defendants, as a result of their outrageous and illegal behavior, are liable to the Estate for the aforementioned injuries as well as punitive damages for Mr. Aden's wrongful death.

430.    Total damages suffered for this wrongful death are in excess of $20,000,000.00 to be further determined at trial.

## COUNT VI
### Municipal Liability – Failure to Train, Failure to Discipline, Failure to Supervise, and Condoning the Use of Excessive Force
### 42 U.S.C. §§ 1983 and 1988
### (Against the Defendant Cities)

431.    The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

432.    The Defendant Cities are liable pursuant to 42 U.S.C. § 1983 for the Law Enforcement Defendants violations of Mr. Aden's rights because the violations were caused by a policy, practice, or custom of the Defendant Cities.  The Defendant Cities' policies, practices, or customs that caused constitutional harm to Mr. Aden included, but are not necessarily limited to, the following:

    a.  The Defendant Cities' practice or custom of using force;

b.  The Defendant Cities' practice of custom of using force, including excessive or deadly force, in the absence of an immediate threat or pursuit;

c.  The Defendant Cities' practice or custom of refusing or failing to use appropriate de-escalation techniques and/or providing inadequate training regarding the use of or de-escalation of force;

d.  The Defendant Cities' practice or custom of using force, including excessive and/or deadly force, against a non-threatening, fully contained and/or compliant suspect;

e.  The Defendant Cities' practice or custom of using force rather than de-escalation techniques and providing inadequate training on situation de-escalation;

f.  The Defendant Cities' practice or custom of using force, including excessive and/or deadly force, against a suspect that is actively engaged in negotiations with law enforcement;

g.  The Defendant Cities' practice or custom of ignoring and/or disregarding negotiations and/or the results of negotiations when electing to use force against a suspect, including excessive and deadly force;

h.  The Defendant Cities' practice of custom of failing or refusing to consult with negotiators regarding the possibility of a peaceful resolution or the necessity of using force, including excessive or deadly force, when evaluating whether to use force against a suspect;

i.   The Defendant Cities' practice or custom of ignoring and/or disregarding the potential risks of bodily injury to the suspect from the application of force by law enforcement;

j.   The Defendant Cities' practice or custom of providing inadequate training regarding the application of deadly force against a suspect;

k.   The Defendant Cities' practice or custom of failing and/or refusing to properly inform officers who will apply force, including by explaining the plan for the use of force or otherwise apprising the officers of the suspect's compliance with law enforcement or statements of intent to surrender; and

l.   The Defendant Cities' failure to provide adequate training regarding the use of less-than-lethal weapons and the effects the deployment of such have upon suspects.

m.   The Defendant Cities' engagement in bias and discriminatory practices or customs of utilizing greater force, or utilizing force more readily, against Black and Somali suspects when compared to Caucasian suspects.

433.   In their failures, the Defendant Cities have been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Mr. Aden, as alleged herein.

434.   As a direct result of the Defendant Cities' failures and policies as described herein, Mr. Aden suffered the aforementioned injuries and the Defendant Cities are liable

to the Estate for the aforementioned injuries and damages as well as punitive damages. Total damages suffered are in excess of $20,000,000.00, to be further determined at trial.

435.    Punitive damages are also properly awarded against Defendants and are hereby claimed as a matter of federal common law, <u>Smith v. Wade</u>, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the different standard of proof set forth in Minn. Stat. § 549.20.

## COUNT VII
### Negligence
**(Against the Law Enforcement Defendants)**

436.    The Estate realleges and incorporates by reference each and every preceding paragraph as if stated in full herein.

437.    The Law Enforcement Defendants were negligent in their election to launch an assault against Mr. Aden who, for the prior hour and a half, had remained seated on the curb, had made no attempt to touch the handgun, which he placed on the ground at the direction of the Law Enforcement Defendants, and remained engaged in negotiations.

438.    The Law Enforcement Defendants were negligent in failing and/or refusing to gather adequate information relating to Mr. Aden from which the risk posed by Mr. Aden could properly be assessed and from which the Law Enforcement Defendants would have concluded that the risk of an assault was grossly disproportionate to the risks posed through continued negotiation.

439.    The Law Enforcement Defendants were negligent in introducing extreme and overwhelming force against Mr. Aden, thereby causing the situation to escalate.

440.    The Law Enforcement Defendants were negligent in permitting the negotiations to last only one hour and sixteen minutes, by failing to appropriately observe the negotiations conducted by Officer Moseng, and by failing or refusing to recognize or appreciate the substantial progress and de-escalation produced by such negotiations.

441.    The Law Enforcement Defendants were negligent in devising an assault plan that inevitably would have forced and ultimately did force Mr. Aden to move in the direction of the weapon, thereby creating the circumstances that Defendants had also planned in advance would lead to Mr. Aden's death.

442.    The Law Enforcement Defendants were negligent in applying less lethal force against Mr. Aden while he was sitting, while he was compliant, and while the handgun remained on the ground.

443.    The Law Enforcement Defendants were negligent in failing to provide medical care to Mr. Aden for more than seven minutes after shooting Mr. Aden more than eleven times.

444.    The Law Enforcement Defendants further acted negligently as described herein.

445.    The injuries and damages sustained by the Estate are a direct and proximate cause of the Law Enforcement Defendants' negligent acts.

## **PRAYER FOR RELIEF**

WHEREFORE, the Estate demands judgment against the Law Enforcement Defendants, after trial by jury, as follows:

1. Awarding the Estate damages attributable to conduct by the Law Enforcement Defendants, jointly or separately, in an amount to be determined at trial, but in excess of $20,000,000.00;

2. Granting judgment with all applicable interest, costs, fees, and disbursements herein, and awarding all monetary, statutory, and other awards to which the Estate is entitled;

3. Awarding the Estate recovery of reasonable attorney fees to the extent allowed by applicable federal or state law; and

4. Granting other legal, injunctive, or equitable relief as the Court deems just and fair.

**ATTORNEYS FOR PLAINTIFF**

/s/ Matthew Lawlyes_____          7/2/2020_____
Matthew Lawlyes                         Date
Minnesota Attorney Lic. No. 0396832
Wilson Law Group
3019 Minnehaha Avenue
Minneapolis, Minnesota 55406
Phone: 612.436.7100
Email: mlawlyes@wilsonlg.com


 /s/ Michael Gavigan_____          7/2/2020_____
Michael D. Gavigan                      Date
Minnesota Attorney Lic. No. 0393053
Wilson Law Group
3019 Minnehaha Avenue
Minneapolis, Minnesota 55406
Phone: 612.436.7100
Email: mgavigan@wilsonlg.com

/s/ Eva Rodelius                                           7/2/2020

Eva Rodelius                                                     Date

Minnesota Attorney Lic. No. 0395621
Wilson Law Group
3019 Minnehaha Avenue
Minneapolis, Minnesota 55406
Phone: 612.436.7100
Email: erodelius@wilsonlg.com

/s/ Hannah Brown                                           7/2/2020

Hannah Brown                                                  Date

Minnesota Attorney Lic. No. 0400017
Wilson Law Group
3019 Minnehaha Avenue
Minneapolis, Minnesota 55406
Phone: 612.436.7100
Fax: 612.436.7101
Email: hbrown@wilsonlg.com

/s Ruth Lane                                              7/2/2020

Ruth Lane                                                       Date

Minnesota Attorney Lic. No. 0398211
Lane Law and CPA Services LLC
8014 Olson Memorial Hwy. 55, Ste. 553
Golden Valley, Minnesota 55427
Phone: 715.379.0487
Email: ruth@ruthlanelaw.com