# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sumaya Aden,
*as next-of-kin and trustee for the Estate of*
*Isak Abdirahman Aden, Decedent,*

        Plaintiff,

v.

City of Eagan, Minnesota; Officer Jacob
Peterson; Officer Matthew Ryan; Officer
Daniel Nelson; Officer Adam Steir;[1]
Officer Anthony Kiehl; Chief Roger New;
Lieutenant Andrew Speakman; and
Sergeant Corey Cardenas,

        Defendants.

Civ. No. 20-1508 (JWB/TNL)

**MEMORANDUM OPINION
AND ORDER
ON SUMMARY JUDGMENT**

---

Cameron Lane Youngs Giebink, Esq., David L. Wilson, Esq., Wilson Law Group; and
Ruth Lane, Esq., counsel for Plaintiff.

Joseph E. Flynn, Esq., and Vicki A. Hruby, Esq., Jardine, Logan & O'Brien, PLLP,
counsel for Defendants.

---

      A foot chase ended with twenty-three-year-old Isak Abdirahman Aden ("Aden")

sitting alone on a curb, gripping a gun, at times pointing the gun at his own head. Over

eighty police officers from eight different police forces converged on the scene and

surrounded Aden. Negotiators engaged him, persuading him to set the gun down and to

move it a couple of feet away. Then, without warning or notice to the negotiators, the

---

[1]     The transcript from Officer Stier's interview reflects the spelling of his last name
is S-T-I-E-R. (Doc. No. 64-5, Ex. 26.) The Court uses the "Stier" spelling throughout this
decision for consistency.

supervising officers launched a surprise assault maneuver aimed at apprehending Aden. The plan went very wrong.

In a surprise tactical use of force, officers fired on Aden with 40 mm foam bullets and deployed "flashbang" grenades near him. The plan was meant to provoke an instantaneous impulse reaction, startling or stunning Aden, and permitting the police to swoop in to arrest him. In the split second after being fired upon and seeing detonating explosives, Aden's immediate reaction was to reach for and grab his gun rather than move away from it, as the police had envisioned. A moment later, holding the gun no higher than his shin, he was shot dead.

Aden's next-of-kin filed suit against the City of Eagan, the supervising officers on scene, and the officers who used lethal force against Aden, asserting claims under 42 U.S.C. § 1983 for excessive force, claims based on improper municipal custom or policy, and other state law claims. Defendants have moved for summary judgment based on qualified immunity for all named officers and assert that Plaintiff's other claims fail.

Defendants' motion for summary judgment is granted in two respects. The officers who deployed lethal munitions are dismissed from Count II, as Count II relates only to the less-lethal munitions. And Plaintiff's substantive due process claim is dismissed because it is subsumed in Plaintiff's Fourth Amendment claim. Defendants' motion for summary judgment is otherwise denied, including their motion based on qualified immunity.

## SUMMARY OF THE INCIDENT

On July 2, 2019, Aden and his ex-girlfriend, T.A., had an argument while sitting in her car. Aden accused T.A. of sharing explicit photographs of him without his consent. Shortly after 6:00 p.m., T.A. called 911 to report that Aden had pulled a gun on her, a claim she later recanted.[2] She stated he ordered her to drive away from her residence. As she neared the Eagan Outlet Mall, she purposely drove into the oncoming traffic lane to attract attention, stopped, and ran away from the vehicle. Aden did not pursue her but ran into a nearby wooded area. Officers from the Eagan Police Department and the Minnesota State Patrol responded.

A gunshot rang out from the wooded area where Aden had run. Aden told negotiators later that his firearm discharged when he had accidentally dropped it. Officers spotted Aden in and around the wooded area, and more officers were discharged to search for him. At approximately 6:45 p.m., officers found Aden crossing a road that led to a commercial area and into an industrial parking lot that abutted a commercial building. Aden held the gun to his head as he walked. He eventually sat down on the parking lot curb with his back to the building, facing an empty parking lot. His gun remained pointed at his head.

The first officers to arrive pointed their guns at Aden and ordered him to put his gun down. One of those officers, Officer Thul, eventually started negotiations with Aden

---

[2]   T.A. later told an officer that when she was in the car with Aden, she saw the gun and was concerned for her safety but that Aden never threatened her with the firearm. There is no evidence the officer communicated this information to negotiators, the commanders on the scene, or the SWAT team.

using a PA system. At one point, Aden set the gun down near his right foot, but then picked it back up again after a few minutes.

The scene was heavily policed. Police officers and special weapons and tactics ("SWAT") teams from multiple cities responded to the scene over time. They wore tactical body armor and helmets, carried military-style assault weapons and less-lethal weapons, and were equipped with bullet-proof and bullet-resistant ballistic shields. Three armored vehicles, including two "Bearcats" and a Mine-Resistant Ambush Protected vehicle ("MRAP"), were deployed. The area was confirmed clear of bystanders. Two snipers were positioned on the rooftop of a building located across the street from Aden's position. Two more snipers were positioned in the grass in front of Aden. All snipers were armed with sniper rifles, and all had their weapons trained on Aden at all times. All together, over eighty officers from eight different police forces converged on the scene.

The SWAT team took over negotiations. Officer Moseng served as the primary negotiator. He started negotiations at 7:25 p.m. from inside a Bearcat armored vehicle. After a cell phone was delivered to Aden, negotiations continued by phone. By 8:56 p.m., Aden had set his gun down on the pavement between his legs. The sun had set just after 9:00 p.m. However, the area was well lit, illuminated with streetlights, surrounding business flood lights, vehicle headlights, and vehicle-mounted spot/flood lights. The next hour of negotiations resulted in Aden moving about a foot and a half to two feet away from the gun at the negotiators' request. The negotiators felt they were making progress in their efforts. Aden had become calmer, put the gun down, and moved away from the gun.

Meanwhile, the command officers were working on a tactical plan to ambush Aden given that he was separated from his gun, planning to use the element of surprise to apprehend him. The plan was to have officers throw flashbang grenades at Aden to disorient him, followed by firing 40 mm less-lethal foam bullet rounds. The strategy contemplated Aden leaning away from the gun in an immediate reaction, shocked and startled, which would create an opportunity for the arrest team to rush in and apprehend him. Sniper teams and other officers would provide lethal cover for the arrest team, in addition to their protective vehicles and gear.

Flashbangs and foam bullets are considered less-lethal types of force. A flashbang grenade produces a bang and blinding flash of light but can injure or kill when detonated in close proximity. 40 mm foam bullets are less lethal ammunition than lead bullets, but still potentially lethal. Defendant City of Eagan Police Chief Roger New, Defendant Burnsville Police Sergeant Maksim Yakovlev, and Defendant Eagan Police Lieutenant Andrew Speakman testified that the less-lethal foam bullets could either cause great bodily injury or become lethal depending on the location of impact. Both the Eagan Police Department's Use of Force Policy and the manufacturer warning for the 40 mm foam bullets also indicate that 40 mm foam bullets can be deadly.

Four supervisory officers were on the scene, including Defendant Chief New. Chief New approved the arrest plan seeking no input from the negotiators and with no notice to them. Chief New testified there was a concern Aden might flee with a firearm

and the police "did not have a secure perimeter."[3] It appears undisputed that Aden had remained seated on the curb for approximately four hours, was in discussions with negotiators, had not threatened anyone, and had not retrieved the gun after setting it down and moving away from it.

The tactical plan was launched at 10:37 p.m. as Aden was talking with negotiators by cell phone. Three flashbangs were thrown and exploded near Aden, and two officers opened fire with foam bullets, striking him in his left side. Rather than instinctively falling to the left and away from the gun when hit, Aden instead moved to his right with the cell phone still in his left hand. He stumbled with his right arm extended down toward the pavement, leaning toward the gun. He grabbed the gun with his right hand. Before the gun was raised to knee height, officers shot him with lethal rounds. As he fell backwards and onto his right side, the pistol discharged at ground level, firing downwards into the ground. He was not facing the firing officers when his weapon discharged. In total, five officers fired lethal rounds, resulting in the eleven gunshot wounds that killed Aden. Some of the shots were fired after he had fallen to the ground.

The following diagram, created by Plaintiff and based on facts of record, approximates law enforcement positions at the time of the shooting. Defendants dispute the facts depicted. Taking the evidence in the light most favorable to Plaintiff as the non-movant on summary judgment, Plaintiff's diagram is used here.

---

[3]     The Bearcats and a mine-resistant vehicle were positioned to create an inner perimeter. Bloomington Police Officer Ryan testified that a 360-degree outer perimeter was secured with the use of police vehicles, officers, and three K-9 units. Lieutenant Speakman also referenced they had a perimeter around Aden.

Fig. A



(Doc. No. 1, Compl. ¶ 243.) It is not disputed that the opening in the fence shown on the bottom right of the diagram should be positioned on the bottom left.

Pursuant to the plan, three officers (Lucas, Sweany, and Tessmer) were assigned to deploy flashbangs. Officers Lucas and Sweany were positioned at the Bloomington PD Bearcat armored vehicle, which was in front of Aden. Officer Tessmer was positioned at the Edina PD Bearcat armored vehicle, which was to Aden's left.

Two officers (Melser and Pilcher) shot 40 mm foam bullets at Aden. Officer Melser was positioned behind the open driver's side door of an Eagan PD patrol vehicle located approximately ninety degrees to Aden's left side. Officer Pilcher was positioned at the right rear corner of the mine-resistant armored vehicle, which was positioned to the far left of Aden.

Five officers (Peterson, Ryan, Nelson, Kiehl, and Stier) fired lethal rounds. Officer Peterson was positioned in the upper turret of the Edina PD Bearcat. Officer Ryan was positioned at the right rear passenger side of the Bearcat. Officer Nelson was positioned at the right rear of the Dakota County mine-resistant armored vehicle. These three officers were armed with semi-automatic rifles. Officers Kiehl and Stier were snipers located on the rooftop of a building across the street from Aden's position, about eighty-four yards away. Both were using rifles equipped with magnification scopes.

At the time the tactical plan was deployed, according to Officer Ryan, an outer perimeter was in place using squad cars, numerous officers in tactical gear, and K-9 units. To Aden's right was a fence on the far end of the parking lot. The fence had an opening to Aden's right. Officers were also stationed on the other side of that fence. All of the officers were positioned either to have coverage to protect themselves or to provide coverage for the protection of other officers.

## DISCUSSION

### I.      Standard of Review

Summary judgment is proper "if the record establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment is inappropriate. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). On summary judgment, evidence is considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).

## II.   Analysis

Defendants seek partial summary judgment on the following Counts from the Complaint:

- Count I: Constitutional violation based on the use of deadly force/unreasonable search and seizure (asserted against the Lethal Force Defendants as individuals)[4];

- Count II: Constitutional violation based on excessive force used with less-lethal munitions and explosives/unreasonable search and seizure (asserted against the Law Enforcement Defendants)[5];

- Count IV: Substantive Due Process violation for the unjustified decision to use deadly and excessive force (asserted against the Supervising Defendants, as individuals);

---

[4]    The "Lethal Force Defendants" are Defendant Officers Peterson, Ryan, Nelson, Stier, and Kiehl. (Compl. ¶ 17.)

[5]    The "Law Enforcement Defendants" include the Lethal Force Defendants and the "Supervising Defendants." The Supervising Defendants are Defendant Chief New, Defendant Lieutenant Speakman, Defendant Bloomington Police Sergeant Corey Cardenas, and Defendant Sergeant Yakovlev. (Compl. ¶ 22.) The parties stipulated to dismiss Yakovlev. (Doc. No. 53.) Plaintiff did not sue the officers who deployed the less-lethal munitions in this suit.

- Count VI: Municipal Liability for failure to train, discipline, or supervise, and condoning the use of excessive force (asserted against the Defendant City); and

- Count VII: Negligence (asserted against the Law Enforcement Defendants).

(*See generally* Doc. No. 1, Compl.) Defendants do not seek summary judgment on the Wrongful Death Count (Count V).

The issues will be addressed in the order of those relating specifically to the less-lethal munition claims first (no individual action, abatement, and qualified immunity), followed by the issues relating specifically to the lethal munition claim (qualified immunity). The last set of issues addressed are Plaintiff's other asserted claims challenged by Defendants (substantive due process, municipal custom or policy, and negligence).

## III.    No Individual Action – Count II

Plaintiff asserts Count II (the less-lethal munition claim) against all the Law Enforcement Defendants (which includes both the Lethal Force Defendants and the Supervising Defendants). Defendants argue that Count II should be dismissed for those Defendants who did not deploy the less-lethal munitions (Officers Peterson, Ryan, Nelson, Kiehl, Stier, New, Speakman, and Cardenas). Plaintiff does not oppose dismissing those Defendants from Count II, except any Defendants who also were supervisors on the scene.

"[A] plaintiff must be able to prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *White v. Jackson*, 865 F.3d 1064, 1076 (8th Cir. 2017) (quotation omitted). Because Officers

Peterson, Ryan, Nelson, Kiehl, and Stier did not deploy foam bullets or flashbang grenades, nor did they supervise or make decisions about the tactical plan to deploy the less-lethal munitions, they are dismissed on Count II. Count II remains against Supervising Defendants New, Speakman, and Cardenas. Whether the Supervising Defendants are entitled to qualified immunity on Count II is addressed in the Qualified Immunity section below.

## IV.   Abatement of Non-Lethal Force Claims

Defendants collectively argue that the Minnesota Wrongful Death Statute bars Plaintiff's non-lethal force claims. The Wrongful Death Statute, as amended, provides otherwise. Not only is a cause of action allowed after a death caused by an act unrelated to the injuries, but also damages are no longer limited only to those specially pled. *See* Minn. Stat. § 573.02, subd. 2 (effective May 20, 2023) ("When injury is caused to a person by the wrongful act . . . and the person thereafter dies from a cause unrelated to those injuries, the trustee . . . may maintain an action for *all damages* arising out of such injury if the decedent might have maintained an action therefor had the decedent lived.") (emphasis added). An action can also be maintained when a death "is caused by the wrongful act[.]" *Id.*, subd. 1. Plaintiff asserts that Aden's death was caused by a chain of events that started with less-lethal force and the tactical plan.[6] The Wrongful Death

---

[6]     Even if a jury were to conclude the officers faced an imminent threat of serious harm in Count I, Plaintiff may still be able to recover damages if Aden's death was "proximately caused" by the separate constitutional violation alleged in Count II (the deployment of the less-lethal rounds). *See County of Los Angeles v. Mendez*, 581 U.S. 420, 431–32 (2017) (remanding for the court to consider whether proximate cause permits respondents to recover damages for their shooting injuries based on the deputies' earlier constitutional violation); *see also Mendez v. County of Los Angeles*, 897 F.3d

Statute does not automatically preclude damages for Aden's death under these
circumstances.

## V.      Qualified Immunity – Counts I and II

Defendants raise qualified immunity as a defense to the claims for use of deadly
and excessive force (Counts I and II). Qualified immunity shields government officials
from § 1983 lawsuits and liability "unless the official's conduct violates a clearly
established constitutional or statutory right of which a reasonable person would have
known." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013). A summary
judgment motion based on qualified immunity must be denied if "(1) the evidence,
viewed in the light most favorable to [Aden], establishes a violation of a constitutional or
statutory right, and (2) the right was clearly established at the time of the violation, such
that a reasonable officer would have known that his actions were unlawful." *Banks v.
Hawkins*, 999 F.3d 521, 524 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 2674 (2022).
Conversely, if either prong is not established, qualified immunity applies and summary
judgment must be granted.

The constitutional right at issue in Counts I and II, the use of force claims, is the
Fourth Amendment right to be free from unreasonable seizure. A seizure occurred when
officers shot both the less-lethal and lethal rounds at Aden. *See Marks v. Bauer*, Civ. No.
20-1913 (ADM/JFD), 2023 WL 1478015, at *6 (D. Minn. Feb. 1, 2023) (concluding

---

1067, 1076–77 (9th Cir. 2018) (concluding on remand that the unlawful entry was the
cause in fact of the injuries and stating that "[t]he injury followed in a normal course as a
result of the unlawful acts of the officers"). That proximate cause determination is not
before the Court and is an issue left for the jury.

plaintiff was seized when a less-lethal projectile knocked him over) (citing *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021)).

Whether those seizures were reasonable will be addressed separately. *See Mendez*, 581 U.S. at 428 ("[T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional.").

### A.     Reasonableness of Less-lethal Munitions

Using the above framework, the issue of whether a constitutional right was violated when officers deployed the less-lethal munitions will be addressed first. This is then followed by a determination of whether that right was clearly established at the time of the shooting.

### i.     Violation of a Constitutional Right

Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. The force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The tactical plan reflected a planned strategy and not a split-second decision. It

was calculated to provoke and capitalize on Aden's immediate reaction to the tactical attack. Defendant Officers New, Speakman, and Cardenas were involved in developing and authorizing the tactical plan to use less-lethal force against Aden. Since the plan depended on the element of surprise, no notice was given to Aden or the active negotiators. The plan also positioned officers in places where they would have cover. The plan called for deploying three flashbang explosive devices within feet of Aden and then firing foam rounds at him. The expectation was that Aden would be fired upon from the left, would be struck on the left side, and would then lean over to his left, putting more distance between him and his gun, on the ground to his right.

In evaluating the reasonableness of the less-lethal force, a court "must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Graham*, 490 U.S. at 396).

The Defendants' view is recounted first. Lieutenant Speakman, one of the supervisors on scene, testified that the tactical plan was initiated at that particular time against Aden because Aden "had already pointed a firearm at a victim, had fled on foot from the scene, fired off a shot in a residential neighborhood, broke through a police perimeter at one point already across Highway 13, was a public safety risk, [and because] darkness was a factor." (Doc. No. 63-11, Ex. 12 at 113.) Lieutenant Speakman also stated that they were concerned that even though they had a perimeter around Aden, he could have tried to break the perimeter and "[h]e had already shown a propensity to put the gun

14

down and pick it back up." (*Id.*) Because "the gun was currently down on the ground," Lieutenant Speakman thought "[i]t was an opportunity to try to take him into custody." (*Id.*)

Factual discrepancies surround this account. For example, Aden's ex-girlfriend, the presumptive victim, denied that he ever threatened her with a gun, and she had reported that fact to an officer on the scene before the launch of the tactical plan. Additionally, Lieutenant Speakman omits the many hours that had elapsed. By the time the less-lethal munitions were deployed, several hours had transpired since the original call to police, and Aden had been sitting stationary in front of officers for hours without moving or threatening anyone. He was sitting still, not threatening or fleeing.

Consideration of the reasonableness of the use of force at the "precise moment" of the seizure is paramount. *See Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1133 (8th Cir. 2020). "[T]he requirement that the threat be reasonably perceived as 'immediate' means that if the threat has passed, so too has the justification for the use of deadly force." *Id.* at 1132; *see also Rahn v. Hawkins*, 73 F. App'x 898, 901 (8th Cir. 2003) (stating that "force that is reasonable while [the] suspect poses [a] threat is no longer reasonable once [the] threat is no longer present").

A reasonable jury could find that at the time less-lethal munitions were deployed, Aden did not pose an immediate threat. Although he had not surrendered, he was not "actively" resisting arrest, was not holding a weapon, and was not verbally or physically threatening anyone. The area had been cleared of all bystanders. Negotiators had convinced Aden to place his gun on the ground and to move away from it, and reported

that they were making good progress at the time of the tactical assault.

Whether the officers involved were meaningfully threatened, given their considerable numbers and having planned cover for themselves before launching the tactical plan, is an open question. Over eighty armed officers surrounded Aden wearing protective tactical gear. At least two dozen of them were within the inner perimeter and many were highly trained members of the elite SWAT teams. Four snipers were in position and rifles were trained on Aden at all times. At least three K-9 units were at the ready should Aden attempt to run. Also on scene were three armored vehicles with officers in the vehicles' gun turrets armed with assault rifles. The area was illuminated with lights. An additional outer perimeter was stationed with dozens more officers and police vehicles.

In the face of this collective force, Lieutenant Speakman nonetheless raised concern about the possibility that Aden could pick up his gun or break their perimeter and pose a threat. An officer's contemplation of the possibility of a threat is not a justification for using significant force. "A future hypothetical—plausible or not—is not a justification for the use of significant force because a threat cannot be immediate when it has not yet materialized." *Anderson v. Avond*, 631 F. Supp. 3d 721, 737 (D. Minn. 2022).

Plaintiff, in response, also addressed the reasonableness of the use of force. Plaintiff's expert Jeffrey Noble, a retired Deputy Police Chief with the Irvine Police Department, addressed this issue. In his opinion, "[n]o reasonable chief of police would have abandoned efforts to secure a negotiated solution in these circumstances." (Doc. No. 75-1, Ex. 74, Noble Expert Report ¶ 68.) Instead, "[a]ny reasonable police officer would

know that a peaceful negotiated surrender is a preferred solution as it decreases the risks to the officers, the suspect and the community of a tactical solution." (*Id.*) Ultimately, Noble opines that "the tactical efforts in this matter directly led to the death of Mr. Aden which otherwise could have been avoided." (*Id.*)

The record also includes the opinion of Plaintiff's police practices expert, Robert Prevot, a police officer, training officer, supervisor, and manager of thirty-four years. In his view, Chief New (who had reviewed, approved, and activated the tactical plan) made a decision "based on false tactical information and a lack of communication between himself and the negotiating team." (Doc. No. 75-4, Ex. 77, Prevot Expert Report at 27– 28.) Prevot opines that the actions taken "at the moment the plan was activated were not justified" because "[t]here was no emergency at that moment." (*Id.*) Specifically, Prevot points out that "[n]ot once did Mr. Aden pick up the gun or stand up from where he was sitting after initially placing the gun on the concrete," "Mr. Aden [did not] threaten[] any police officer or anyone else at the scene," he was "engaged in negotiations with police," "lighting was available and could have been deployed at potential points of attempted escape," "officers were not exposed to immediate gunfire by Mr. Aden," and "officers deployed as snipers could have reacted immediately if ordered to do so." (*Id.*)

Considering the totality of these circumstances, viewing the record in the light most favorable to Aden, and drawing all inferences in his favor, a reasonable jury could conclude that any immediate threat had been extinguished at the time the tactical plan was deployed and that the use of less-lethal force was objectively unreasonable. *See Marks*, 2023 WL 1478015, at *9 (concluding a reasonable jury could conclude threat had

been extinguished when plaintiff was not holding a weapon and was stumbling backwards when he was shot); *see also Rohrbough v. Hall*, 586 F.3d 582, 586 (8th Cir. 2009) (holding a jury could conclude officer's use of force was excessive because plaintiff's pushing of the officer may have been inconsequential); *Glenn v. Washington Cnty.*, 673 F.3d 864, 874 (9th Cir. 2011) (holding a jury could conclude that when officers shot individual with a beanbag gun there was little evidence he posed an "immediate threat" to anyone, even though he remained in possession of a pocketknife); *United States v. Morris*, 349 F.3d 1009, 1012 (7th Cir. 2003) (emphasizing that flashbang devices are dangerous and cautioning that using such devices in close proximity to suspects may not be reasonable). Therefore, the use of force, including the use of 40 mm foam rounds and flashbang grenades, cannot be deemed objectively reasonable as a matter of law. Instead, the evidence, when viewed in Aden's favor, presents material fact issues on whether the supervising officers violated Aden's constitutional right to be free from excessive force in the execution of the tactical plan.

## ii.   Clearly Established Right

To overcome the Supervising Defendants' qualified immunity defense, the right in question must have been clearly established. To show that a right was clearly established, a plaintiff can: (1) "point to existing circuit precedent that involves sufficiently similar facts to squarely govern the officer's actions such that the officer had notice that his specific use of force was unlawful"; (2) "present a robust consensus of cases of persuasive authority doing the same"; or (3) "demonstrate that a general constitutional rule applied with obvious clarity to the facts at issue." *Boudoin v. Harsson*, 962 F.3d

18

1034, 1040 (8th Cir. 2020) (internal citations and quotations omitted).

Here, the officers had notice that as of July 2, 2019, launching flashbang grenades within close range and shooting 40 mm foam rounds directly at a person who did not present an immediate threat of death or serious injury amounts to unconstitutional excessive force. *See, e.g.*, *Johnson v. Carroll*, 658 F.3d 819, 827–28 (8th Cir. 2011) (holding that making and throwing suspect to the ground was excessive when plaintiff was unarmed and "posed at most a minimal safety threat to the officers"); *Estate of Escobedo v. Bender*, 600 F.3d 770, 780–81 (7th Cir. 2010) (finding no qualified immunity for officers who threw flashbangs into a room where the individual "was not posing an immediate threat to the officers or the public, the standoff was only three hours old, and the officers making the tactical decisions did not have all of the relevant and critical information regarding the negotiations," and the individual had not threatened to harm anyone but himself); *see also Glenn*, 673 F.3d at 872 ("[W]e are aware of no published cases holding it reasonable to use a *significant* amount of force to try to stop someone from attempting suicide.") (emphasis in original). Also, as previously noted, the law is settled that if a threat has passed, so too has the justification for the use of force. *See Wallace v. City of Alexander*, 843 F.3d 763, 766, 769 (8th Cir. 2016) (finding use of deadly force objectively unreasonable where the suspect "had discarded the gun and begun to flee" and "did not move toward his gun or act in a threatening manner").

As analyzed above, the evidence, when viewed in the light most favorable to Aden, shows that he did not pose a significant or immediate threat to the officers or others at the time the less-lethal munitions were deployed because he was unarmed,

19

sitting down, talking with negotiators, not using threatening language, and was surrounded by over eighty armed and protected police officers, including positioned SWAT snipers. Less than four hours had transpired since negotiations began. Prior to putting the gun down, Aden had only ever pointed his gun at his own head. Any arguable immediate threat had dissipated by the time the Supervising Defendants gave the go-ahead to deploy the tactical plan.

The use of force, even if "less-lethal," was disproportionate to the threat presented, and no officer would have needed to "consult a casebook . . . to recognize the unreasonableness of using [such] force . . . against a man" who posed no immediate threat at the time the flashbang grenades and 40 mm foam rounds were fired. *See Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1212 (8th Cir. 2013) (quotations omitted) (finding that officer had "fair warning" that charging a non-resisting individual in that circumstance was unconstitutional); *cf. White v. Jackson*, 865 F.3d 1064, 1073, 1079–80 (8th Cir. 2017) (holding that use of projectiles was reasonable where protester continued approaching after officers commanded him to stop).

For these reasons, Defendants' motion for summary judgment on Count II (as asserted against the Supervising Defendants) based on qualified immunity is denied.

### B.    Lethal rounds

Defendants also seek summary judgment based on qualified immunity on Count I, which alleges a violation of Aden's constitutional rights for the use of deadly force.

### i.    Clearly Established Right

The dispute here is not over the law, which was clearly established well before the

July 2, 2019 incident. "[A] person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion." *Cole*, 959 F.3d at 1134 (stating the law was clearly established as of October 25, 2016). Absent probable cause to believe the suspect poses "an immediate threat of death or serious bodily injury" to others, an officer's "use of deadly force is not objectively reasonable." *Billingsley v. City of Omaha*, 277 F.3d 990, 993 (8th Cir. 2002) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Whether qualified immunity applies to the Lethal Force Defendants turns on whether Aden posed an immediate threat of serious physical harm when the officers shot him with lethal rounds.

### ii.    Reasonableness of Lethal Force Factors

When evaluating the reasonableness of lethal force, a court must consider the totality of the circumstances, including the same factors scrutinized for non-lethal force, including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest." *Loch*, 689 F.3d at 965. Use of deadly force is reasonable where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *see also Ellison v. Lesher*, 796 F.3d 910, 917 (8th Cir. 2015) (stating that deadly force is appropriate only in response to "a significant threat of death or serious physical injury to the officer or others"). The issuance of a warning is important. If feasible, an officer should give a warning before using deadly force. *Garner*, 471 U.S. at 11–12.

21

The reasonableness of the use of force is evaluated under an "objective" inquiry that pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'" *Cole*, 959 F.3d at 1132 (quoting *Partridge v. City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019)); *see also id.* at 1134–35 (stating that "a person in possession of a firearm is not an immediate threat unless he appears 'ready to shoot'") (citing *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009)); *cf. Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014) (finding use of deadly force objectively reasonable where suspect "move[d] the shotgun in such a way that the officers believed [he] was aiming the barrel of the shotgun at them").

While pointing a gun at officers can certainly be "menacing action," and an immediate threat, an individual who is retreating, turning away, or not pointing a gun may be deemed "not menacing," and using lethal force without warning may be deemed unjustified. *Partridge v. City of Benton*, 70 F.4th 489, 492 n.2 (8th Cir. 2023); *see also Partridge*, 929 F.3d at 565–67 (concluding that "no reasonable officer" would have viewed the individual as an "immediate threat" where, although armed and possibly intoxicated, the individual was only pointing a gun at his own head and "began to move the gun away from his head" when he was shot). However, when the evidence "does not indisputably establish where and how [the individual] moved the gun as he was shot," a trial is required to determine whether a menacing action occurred. *Partridge*, 70 F.4th at

22

492 n.2.

### a. Totality of Circumstances – Immediacy of the Threat

The severity of the crime, one of the use of force factors, loses its force against a backdrop of multiple hours having passed and Aden's non-threatening and de-escalating conduct during the hours of ongoing negotiations. And whether Aden was "actively" fleeing at the moment of the fatality, another factor for consideration, is certainly debatable since he was fatally shot before taking a single step. The critical remaining question, however, is whether Aden posed an immediate threat to the safety of the officers at the moment the lethal rounds were fired.

Additional factors from that evening, as previously outlined, raise a fact question regarding the officers being in immediate danger of death or serious bodily injury at the time of the fatal shooting. Those factors include the number of officers on the scene, their positioning relative to Aden, the protective measures they had taken and the protective gear they were wearing, and their ability to see Aden from their vantage points. As earlier detailed, the extent of armed officers and protective equipment was extraordinary, including highly trained SWAT team members, snipers with magnified scopes trained on Aden, and dozens of other officers and K-9 units. The officers were strategically placed in protective positions with clear sightlines on Aden—some inside armored vehicles, and others in or behind various police vehicles. The area was well-lit, and a communication center was established to discuss updates among officers about Aden's actions. Additionally, the very objective of the tactical attack plan was to provoke Aden's immediate reaction, and the officers had prepared for it. Under these circumstances, a

23

jury could reasonably conclude that the officers did not face an imminent threat of serious harm.

The officers did not warn Aden that they would be firing less-lethal rounds, nor did they issue a warning about the potential use of lethal rounds should he reach for his gun again. "When a warning is feasible, the failure to warn adds to the unreasonableness of the use of deadly force." *Cole*, 959 F.3d at 1133 (quotations omitted). While a lack of warning does not automatically deem the use of deadly force unreasonable, it does exacerbate the circumstances and can influence the assessment of whether the use of deadly force was objectively reasonable. *Id.* In this case, the officers decided to implement a tactical plan that was not communicated to all officers present, including the negotiators actively engaged on the scene, or to Aden himself.

### b. Fact Issues

Defendants contend that a reasonable officer would have perceived that Aden was turning to point and shoot his gun at the officers who were shooting at him. Their argument is based on officer testimonies, reports, and various video footage and snapshots taken from the scene. According to them, after the initial less-lethal rounds were fired, Aden stood up, grabbed his gun, and began to raise it. Upon firing the shots, they state Aden rotated his left shoulder toward the officers, gun still in hand, prompting additional shots to be fired. One officer testified that Aden stood up, grabbed the gun, pointed it, and moved "right towards the bearcat." (Doc. No. 64-15, Ex. 36, Kiehl Tr. at 3, 5.) Another officer testified that Aden "jumped up from his seated position . . . lunged directly toward the gun," and from his vantage, "it looked like he was . . . starting to point

24

it in the direction of the officers that were on my left." (Doc. No. 64-4, Ex. 25, Peterson Tr. at 11.) The officers who fired lethal rounds justified their actions by expressing a belief that Aden was an imminent threat to fellow officers. Despite the point of the tactical plan of attack being to provoke an impulse reaction, one officer judged Aden's reaction stating he believed Aden's intent for reaching for the gun was with malice. (Doc. No. 64-5, Ex. 26, Stier Tr. at 5, 7–8 ("[T]he only reason for him to go to that gun was having ill intentions with it.").)

Plaintiff challenges the Defendants' narrative of the events, stating that Aden never lifted his arm, pointed the gun at any officer, or moved toward any of them. Plaintiff argues that, given the entirety of the circumstances on the scene, a reasonable officer would not have perceived Aden as an immediate threat.

Plaintiff's perspective on the chain of events is supported by facts in the record, including evidence showing who shot and when. Officer Peterson, positioned in the upper turret of the Edina PD Bearcat armored vehicle and armed with an AR-15/M-4 .223 caliber semi-automatic rifle, fired the first lethal round (2.63 seconds after the less-lethal rounds were deployed). He ultimately shot the most rounds with seven. Following him was Officer Ryan, positioned at the right rear passenger side of the Bearcat armored vehicle, also armed with an AR-15/M-4 .223 caliber semi-automatic rifle. Plaintiff's evidence suggests that when Officer Peterson fired his first shot, Aden was moving to his right while in a hunched posture—not standing upright—and the gun in his right hand was directed toward the ground, not at the officers. By the time Officer Peterson discharged his second and third rounds (and Officer Ryan fired his first of two rounds),

only a second after Peterson's initial shot, Aden had fallen and was seated on the ground, with his right hand still pointed downwards. Shortly after, Officer Peterson fired a fourth time, and by then Aden was lying on his right side with his right elbow on the ground.

The subsequent shots were all fired while Aden was on the ground. (*See* Doc. No. 75-2, Ex. 75, Martinelli Report at 47–52, 56–57.) This includes the remaining three shots from Officer Peterson, an additional shot from Officer Ryan, one lethal round from Officer Nelson who was positioned at the right rear of the Dakota County armored vehicle, and shots from Officers Stier and Kiehl, the two snipers stationed across the street.

Plaintiff presents expert opinions contesting the Defendants' account of the force used. Experts Ron Martinelli in law enforcement practices, Lance Martini as a Firearms Criminalist, and Travis Woodbury in police sniper practices, after reviewing the video evidence and officer testimonies, conclude that the evidence does not substantiate Defendants' claim that Aden posed an imminent threat of serious bodily injury to the other officers at the scene. According to them, the video demonstrates that Aden did not run toward officers, did not raise the gun to chest level, and did not point the gun at the officers. Instead, Aden moved to his right side without making any threatening gestures. (Doc. No. 75-2, Ex. 75, Martinelli Report at 40–41, 42, 43, 55, 59, 63, 66, 68, 70; Doc. No. 76-1, Ex. 79, Martini Report at 17; *see also* Doc. No. 75-3, Ex. 76, Woodbury Report at 25.)

More specifically, Martinelli says that most of the shots from Officer Peterson and the two from Officer Ryan were fired when Aden was already down, seated with his

handgun not aimed at any officer, or entirely down on his right side without posing an immediate threat to any of the officers. (Doc. No. 75-2, Ex. 75, Martinelli Report at 47–52, 59.) He adds, at the time Officer Nelson fired his single round, Aden had already been hit multiple times by both less lethal and lethal rounds, was down on his right side, and was "not moving in any type of threatening manner." (*Id.* at 41.) Martinelli concludes that based upon the recorded media from the Mains Squad video, "Aden did not pose a credible imminent life-threat towards any of the officers at the scene" when either Officer Kiehl or Officer Stier fired upon him. (*Id.* at 65, 70.)

Plaintiff's evidence challenges the Defendants' narrative that Aden was standing up, turning toward the officers, moving toward the Bearcat, and pointing the gun at the officers. Discrepancies also exist on how Aden moved the gun before each lethal shot. The legitimacy of inferences drawn from the facts is a task for the jury, not the court. *Anderson*, 477 U.S. at 255; *see also Wilson v. City of Des Moines*, 293 F.3d 447, 454 (8th Cir. 2002) ("Because of the internal discrepancies and variations in the officers' testimony, among other things, there remain factual issues in dispute that prohibit a grant of summary judgment."). Here, "[w]here the weapon was . . . and what was happening with the weapon are all inquiries crucial to the reasonableness determination . . . [and] the ultimate determination depends on the risk presented, evaluating the totality of the circumstances surrounding the weapon." *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016); *see also Partridge*, 70 F.4th at 492 n.2 (stating that when the evidence "does not indisputably establish where and how [the individual] moved the gun" the court should not conclude the person took a "menacing action" without a trial).

27

Plaintiff has provided sufficient evidence, including expert opinion, for a jury to find no such threat, and accordingly to find the force used against Aden objectively unreasonable and a violation of his constitutional rights. *See Partridge*, 70 F.4th at 491 (citing *Zubrod v. Hoch*, 907 F.3d 568, 575 (8th Cir. 2018)); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("[T]o defeat the motion for summary judgment, the plaintiffs needed to present enough evidence to permit a reasonable jury to conclude that [the officer's] use of deadly force was objectively unreasonable."); *see also George v. Morris*, 736 F.3d 829, 838–39 (9th Cir. 2013) (stating that the officers' use of deadly force would be objectively unreasonable if it were true that, although the individual held a gun, he had the gun "trained on the ground" and did not make a "furtive movement, harrowing gesture, or serious verbal threat" before being shot); *Glenn*, 673 F.3d at 879 (finding that where the plaintiff argued that the individual was not running toward the front door to attack his family but instead "took one or two steps seeking cover from the beanbag rounds by moving in the most obvious line of retreat," there were "disputed facts and inferences [that] could support a verdict for either party, and the jury must resolve these factual disputes").

Because there is a genuine fact dispute about whether Aden pointed his gun at the officers and whether the officers were in immediate threat of serious harm, summary judgment is precluded. Consequently, Defendants' motion for summary judgment on Count I based on qualified immunity is denied.

## VI.    Other Counts

### A.    Count IV – Substantive Due Process Claim

Plaintiff asserts a substantive due process claim under the Fourteenth Amendment against the Supervising Defendants based on their unjustified decision to use excessive force. Defendants seek summary judgment, contending that any due process claim involving the use of force in this case is subsumed in the Fourth Amendment claim asserted against the Supervising Defendants in Count II. Defendants are correct.

"Where a particular [constitutional] amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Smithson v. Aldrich*, 235 F.3d 1058, 1064 (8th Cir. 2000) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). In the due process claim, Plaintiff alleges that the decision to use violence against Aden, rather than continued negotiations, violated his rights. (*See* Compl. ¶¶ 414–21.) This claim is properly addressed under the Fourth Amendment claim brought in Count II. Accordingly, the Supervising Defendants are entitled to summary judgment on Count IV, Plaintiff's due process claim. Count IV is dismissed.

### B.    Count VI – *Monell* Claim

Plaintiff asserts a claim against the City of Eagan under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Originally, Plaintiff sought municipal liability for failure to train, discipline, or supervise, and for condoning the use of excessive force. Plaintiff has since narrowed this claim, dropping the allegations "for

failure to train and failure to discipline found in Count VI as well as all *Monell*

allegations alleging a pattern or practice of claimed unconstitutional acts[.]" (Doc. No. 90

at 1; *see also* Doc. No. 92, Order for Partial Dismissal With Prejudice.) What remains is a

claim for "failure to supervise, condoning the use of excessive force, and Plaintiff's

*Monell* claim based on the theory [that] Chief Roger New, in authorizing the tactical plan

to proceed, set the City of Eagan's official policy[.]" (*Id.* at 2.) Defendants request

summary judgment on this claim, asserting there is "no evidence" to support it. (Doc. No.

62, Defs.' Mem. at 58.)

A municipality may be held liable under § 1983 if municipal policy violates a right

protected by the constitution or federal laws. *Monell*, 436 U.S. at 692. "[M]unicipal

liability may be imposed for a single decision by municipal policymakers under

appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

"*Monell*'s language makes clear that it expressly envisioned other officials whose acts or

edicts may fairly be said to represent official policy . . . and whose decisions therefore

may give rise to municipal liability." *Id.* (quotation omitted). "[M]unicipal liability under

§ 1983 attaches where—and only where—a deliberate choice to follow a course of action

is made from among various alternatives by the official or officials responsible for

establishing final policy with respect to the subject matter in question." *Id.* at 483.

Plaintiff alleges that Chief New was Eagan's final policymaker on the officers' use

of force decision and provides factual support for that contention. (*See* Doc. No. 72, Pl.'s

Mem. 55–58.) Defendants have not rebutted this contention. Nor have Defendants

rebutted the contention that Chief New created and approved the tactical plan on the night

of July 2, 2019. Considering this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, and because both Fourth Amendment claims (Counts I and II) survive summary judgment, municipal liability also may attach here. *See Thompson*, 257 F.3d at 899 ("The § 1983 claims will not lie against [the officers] individually or against the city unless plaintiffs can prove an underlying violation of [plaintiff's] Fourth Amendment rights."); *Wealot v. Brooks*, 865 F.3d 1119, 1128 (8th Cir. 2017) ("[F]or municipal liability to attach, individual liability first must be found on an underlying substantive claim."). Therefore, Defendants' motion for summary judgment on the *Monell* claim (Count VI) is denied.

### C.    Count VII – Negligence

Finally, Defendants seek summary judgment on Plaintiff's common law negligence claim. They assert the Law Enforcement Defendant officers are all entitled to official immunity (and the City of Eagan is entitled to vicarious official immunity).

Official immunity shields public employees from liability for alleged negligence committed while performing discretionary acts within their official duties. *Boude v. City of Raymore, Mo.*, 855 F.3d 930, 935 (8th Cir. 2017). The use of force in the performance of an officer's duties is a discretionary act. *Id.* Official immunity, however, is lost if the official commits a willful or malicious wrong. *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn. 1991). Both willful and malicious are defined as "the intentional doing of a wrongful act without legal justification or excuse." *Holmes v. Minneapolis Dep't of Civil Rights*, Civ. No. 08-06133 (PJS/JSM), 2010 WL 391338, at *5 (D. Minn. Jan. 26, 2010) (quoting *Rico*, 472 N.W.2d at 107); *see also Shqeirat v. U.S. Airways Grp., Inc.*, 645 F.

Supp. 2d 765, 788 (D. Minn. 2009) (stating willful or malicious wrong exception applies "only when an official intentionally commits an act that he or she has reason to believe is prohibited") (quotations omitted).

Here, the record reflects that the officers acted intentionally. The Supervising Defendants discussed and approved the tactical plan, showing their intention to proceed in the manner they did. And the Lethal Force Defendants explained their reasons for pulling their triggers when they did—all showing intentional action.

The question is whether the less-lethal and lethal shootings were wrongful acts without legal justification. As discussed above, it would have been clear to a reasonable officer that the less-lethal force deployed was disproportionate to the threat presented, viewing the facts about that threat in the Plaintiff's favor. And regarding the lethal force, a genuine fact dispute remains as to whether Aden pointed his gun at the officers and whether the officers were in immediate threat of serious harm. Without those fact disputes resolved, whether the lethal shootings were wrongful acts without legal justification cannot be determined. For these reasons, Defendants' motion for summary judgment on the negligence claim (Count VII) is denied.

**ORDER**

Based on the file, record, and proceedings, and for the reasons stated above,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 60) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that (1) Count II is dismissed as asserted against Officers Peterson, Ryan, Nelson,

Kiehl, and Stier; and (2) Count IV is dismissed. The motion is otherwise denied.


Date: September 29, 2023                        *s/ Jerry W. Blackwell*
                                                JERRY W. BLACKWELL
                                                United States District Judge